No. 25-50855

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

MOHAMMAD BOZORGI; KEN CALDERONE; MANOHAR K. RAO, individually and on behalf of all others similarly situated; all persons or entities who, between September 14, 2020 and October 12, 2023, purchased or otherwise acquired Cassava Sciences, Inc., securities,

*Plaintiffs-Appellees*

v.

CASSAVA SCIENCES, INCORPORATED; REMI BARBIER; ERIC J. SCHOEN; LINDSAY BURNS,

*Defendants-Appellants*

On Appeal from the United States District Court for the Western District of Texas, Austin Division, Case No. 1:21-cv-00751-DAE

## APPELLANTS' OPENING BRIEF

Douglas W. Greene
Zachary R. Taylor
C. Shawn Cleveland
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 847-7090
dgreene@bakerlaw.com

*Counsel for Defendants-Appellants Remi Barbier and Lindsay Burns*

Gregg Costa
  *Counsel of Record*
Monica K. Loseman
Scott Campbell
Brian Richman
Lloyd S. Marshall
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
gcosta@gibsondunn.com

*Counsel for Defendants-Appellants Cassava Sciences, Inc. and Eric J. Schoen*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50855,

MOHAMMAD BOZORGI; KEN CALDERONE; MANOHAR K. RAO,
individually and on behalf of all others similarly situated; all persons or
entities who, between September 14, 2020 and October 12, 2023,
purchased or otherwise acquired Cassava Sciences, Inc., securities,

*Plaintiffs-Appellees*

v.

CASSAVA SCIENCES, INCORPORATED; REMI BARBIER; ERIC J. SCHOEN;
LINDSAY BURNS,

*Defendants-Appellants*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees and Class | Counsel for Plaintiffs-Appellees and Class |
| --- | --- |
| Mohammad Bozorgi<br><br>Ken Calderone<br><br>Manohar K. Rao<br><br>All persons or entities who, between September 14, 2020 and October 12, 2023, purchased or otherwise acquired Cassava Sciences, Inc. securities | ROBBINS GELLER RUDMAN & DOWD LLP<br>Daniel S. Drosman<br>Jessica T. Shinnefield<br>Kevin A. Lavelle<br>Heather G. Geiger<br>Jeremy W. Daniels<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058 |

# CERTIFICATE OF INTERESTED PERSONS
(continued)

| Defendants-Appellants | Counsel for Defendants-Appellants |
|---|---|
| Cassava Sciences, Inc.<br><br>Eric J. Schoen<br><br>Remi Barbier<br><br>Lindsay Burns | GIBSON, DUNN & CRUTCHER LLP<br>Gregg Costa<br>Lloyd S. Marshall<br>811 Main St., Suite 3000<br>Houston, TX 77002<br>Telephone: (346) 718-6600<br><br>Monica K. Loseman<br>Scott Campbell<br>1801 California St.<br>Denver, CO 80202<br>Telephone: (303) 298-5700<br><br>Brian Richman<br>2001 Ross Avenue, Suite 2001<br>Dallas, TX 75201<br>Telephone: (214) 698-3100<br><br>Patrick J. Fuster<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Telephone: (213) 229-7000<br><br>BAKER & HOSTETLER LLP<br>Douglas W. Greene<br>Zachary R. Taylor<br>45 Rockefeller Plaza<br>New York, NY 10111<br>Telephone: (212) 847-7090 |

## CERTIFICATE OF INTERESTED PERSONS
(continued)

|  | C. Shawn Cleveland<br>2850 N. Harwood St., Suite 1100<br>Dallas, TX 75201<br>Telephone: (214) 210-1210 |
|---|---|

Respectfully submitted,

/s/ *Gregg Costa*
Gregg Costa

*Counsel of Record for*
*Defendants-Appellants Cassava*
*Sciences, Inc. and Eric J. Schoen*

# STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument because this appeal is the first time an appellate court will consider the application of the presumption of reliance in the context of meme-stock volatility. The appeal also raises related important questions about Plaintiffs' typicality as class representatives and their ability to capture, through a reliable methodology, damages stemming only from the allegedly unlawful conduct. Oral argument may help the Court assess these issues.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ................................................................ i

Statement Regarding Oral Argument ...................................................... iv

Table of Authorities ................................................................................ vii

Introduction ............................................................................................... 1

Jurisdictional Statement........................................................................... 5

Issues Presented ....................................................................................... 6

Statement of the Case ............................................................................... 7

    A.    Cassava becomes a meme stock that experiences massive price swings untethered from news ........................ 7

    B.    Plaintiffs claim securities fraud following allegations of data inconsistencies ............................................................ 14

    C.    Plaintiffs seek to certify a class while disregarding the effect of Cassava's meme-stock status ................................ 15

    D.    The district court restricts Defendants' ability to respond to Plaintiffs' new evidence ..................................... 18

    E.    The district court certifies the class .................................... 19

Summary of the Argument .................................................................... 22

Standard of Review ................................................................................ 26

Argument ................................................................................................. 26

I.    Plaintiffs cannot establish their claims through a classwide presumption of reliance because meme-stock dynamics plagued Cassava's securities ....................................................... 28

    A.    Courts can presume reliance only when the market price efficiently incorporates public information and most investors rely on the integrity of the market price .... 29

    B.    The district court erred in disregarding meme-stock dynamics when applying a presumption of reliance ........... 36

# TABLE OF CONTENTS
(continued)

**Page**

      1.   Plaintiffs neglected their burden to reconcile Cassava's wild price swings with the efficient market hypothesis .......................... 36

      2.   Even if the market was efficient, the large number of class members who did not rely on the integrity of the market price defeats predominance ...................................................... 51

II.   If most class members relied on the integrity of the market price, then Plaintiffs are atypical class representatives .............. 54

III.  The district court erred in concluding that Plaintiffs could reliably calculate classwide damages consistently with their theory of liability ........................................................................... 61

IV.  Serious procedural errors mar the class-certification order ........ 66

Conclusion .................................................................................................... 70

Certificate of Service ................................................................................. 73

Certificate of Compliance ......................................................................... 73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Restaurant,*
   570 U.S. 228 (2013) ............................................................................ 27

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
   568 U.S. 455 (2013) ..................................................................... 29, 51

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) .................................. 3, 6, 15, 16, 30, 31, 33, 35, 60

*Bell v. Ascendant Solutions, Inc.,*
   422 F.3d 307 (5th Cir. 2005) ........................... 30, 33, 34, 37, 43, 44, 50

*Blue Chip Stamps v. Manor Drug Stores,*
   421 U.S. 723 (1975) .............................................................................. 29

*In re BP p.l.c. Sec. Litig.,*
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ....................................... 66

*Bratya SPRL v. Bed Bath & Beyond Corp.,*
   752 F. Supp. 3d 34 (D.D.C. 2024) ..................... 4, 23, 38, 41, 44, 45, 46

*Cammer v. Bloom,*
   711 F. Supp. 1264 (D.N.J. 1989) ................................. 32, 39, 40, 42, 43

*Camper v. Calumet Petrochemicals, Inc.,*
   584 F.2d 70 (5th Cir. 1978) ................................................................. 69

*Chavez v. Plan Benefit Servs., Inc.,*
   957 F.3d 542 (5th Cir. 2020) ............................................................... 61

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013) ...................................................... 24, 27, 62, 64, 65

*Cruson v. Jackson Nat'l Life Ins. Co.,*
   954 F.3d 240 (5th Cir. 2020) ................................................... 25, 62, 63

vii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cummings v. Missouri,*
71 U.S. (4 Wall.) 277 (1867)................................................................. 50

*In re Deepwater Horizon,*
739 F.3d 790 (5th Cir. 2014)............................................................... 64

*Elson v. Black,*
56 F.4th 1002 (5th Cir. 2023) ............................................................. 30

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011)..................................................................... 29, 30

*George v. China Auto. Sys., Inc.,*
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ................................... 47, 48

*Georgia Firefighters' Pension Fund v. Anadarko*
*Petroleum Corp.,*
99 F.4th 770 (5th Cir. 2024) ............................................. 26, 68, 69, 70

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.,*
594 U.S. 113 (2021)............................................................... 31, 46, 48

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014).............. 4, 22, 23, 31, 32, 35, 40, 47, 51, 53, 60, 61

*Ibe v. Jones,*
836 F.3d 516 (5th Cir. 2016)............................................................... 55

*In re Initial Pub. Offerings Sec. Litig.,*
471 F.3d 24 (2d Cir. 2006) ................................................................. 53

*In re Jan. 2021 Short Squeeze Trading Litig.,*
2023 WL 9035671 (S.D. Fla. Nov. 13, 2023)..................................... 34

*In re Jan. 2021 Short Squeeze Trading Litig.,*
76 F.4th 1335 (11th Cir. 2023) ...................................................... 9, 37

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Kornman & Assocs., Inc. v. United States,*
    527 F.3d 443 (5th Cir. 2008) ................................................................ 8

*Krogman v. Sterritt,*
    202 F.R.D. 467 (N.D. Tex. 2001) ...................................... 32, 37, 46, 49

*Ludlow v. BP, P.L.C.,*
    800 F.3d 674 (5th Cir. 2015) ............................................................. 52

*Merrill v. S. Methodist Univ.,*
    806 F.2d 600 (5th Cir. 1986) ............................................................. 69

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.,*
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .................................... 63

*In re Overstock Sec. Litig.,*
    119 F.4th 787 (10th Cir. 2024) .......................................................... 38

*In re Petrobras Sec.,*
    862 F.3d 250 (2d Cir. 2017) .............................................................. 33

*In re PolyMedica Corp. Sec. Litig.,*
    453 F. Supp. 2d 260 (D. Mass. 2006) ................................................ 44

*Prantil v. Arkema Inc.,*
    986 F.3d 570 (5th Cir. 2021) ....................................................... 26, 68

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
    725 F.3d 244 (D.C. Cir. 2013) ..................................................... 63, 66

*Regents of Univ. of Cal. v. Credit Suisse First
    Boston (USA), Inc.,*
    482 F.3d 372 (5th Cir. 2007) ....................................................... 30, 61

*Smilovits v. First Solar, Inc.,*
    295 F.R.D. 423 (D. Ariz. 2013) ......................................................... 44

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Sodha v. Golubowski*,
    154 F.4th 1019 (9th Cir. 2025) ............................................................. 8

*Students for Fair Admissions, Inc. v. President and Fellows*
    *of Harvard College*,
    600 U.S. 181 (2023) ................................................................................ 50

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ............ 3, 22, 26, 30, 32, 33, 34, 40, 44, 47

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ......................................... 63

*In re Vivendi Universal, S.A. Sec. Litig.*,
    123 F. Supp. 3d 424 (S.D.N.Y. 2015) .................................................. 52

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .......................................................... 26, 27, 34, 54

*Warren v. Reserve Fund, Inc.*,
    728 F.2d 741 (5th Cir. 1984) .................................................. 24, 55, 60

*Zlotnick v. TIE Commc'ns*,
    836 F.2d 818 (3d Cir. 1988) ................................................................ 53

**Statutes**

15 U.S.C. § 78aa(a) ...................................................................................... 5

28 U.S.C. § 1292(e) ...................................................................................... 6

28 U.S.C. § 1331 ........................................................................................... 5

28 U.S.C. § 2072(b) .................................................................................... 54

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Regulations**

21 C.F.R. § 10.25(a) ................................................................... 14

**Rules**

Fed. R. Civ. P. 23(a)(3) ................................................... 21, 27, 55

Fed. R. Civ. P. 23(b)(3) ......................................................... 3, 29

Fed. R. Civ. P. 23(f) .................................................................. 6

**Other Authorities**

Sue S. Guan, *Meme Investors and Retail Risk*,
  63 B.C. L. Rev. 2051 (2022) ................................................ 38

Christine Hurt & Paul Stancil, *Short Sellers, Short Squeezes,
  and Securities Fraud*, 47 J. Corp. L. 106 (2021) ................. 51

*Prospectus, Roundhill Meme Stock ETF (MEME)*
  (Oct. 7, 2025) ...................................................................... 12

SEC, *Staff Report on Equity and Options Market Structure
  Conditions in Early 2021* (Oct. 14, 2021) ..................... 38, 45

World Bank, *Stocks Traded, Turnover Ratio of
  Domestic Shares* ................................................................ 41

## INTRODUCTION

In recent years, meme stocks have upended traditional economic assumptions about rational investor behavior. Their prices have surged and collapsed without any new, material information that would cause ordinary investors to reassess a company's fundamentals. The source of that volatility lies not in securities filings or corporate disclosures, but in coordinated trading through social-media platforms like Reddit and Twitter (now X)—often with the express goal of squeezing short sellers and forcing artificial price movements. Lower barriers to market access, including zero-fee trading on platforms like Robinhood, have disrupted the usual balance between institutional and retail investors and produced volatility that no version of the efficient-market hypothesis can explain.

Cassava Sciences became a leading example of that phenomenon during the class period. Shortly after Robinhood restricted retail trading in the two paradigmatic meme stocks—GameStop and AMC—Cassava's ticker flooded social-media forums frequented by meme traders. Its stock price soon began rising and falling repeatedly, often violently, in ways untethered from news and inconsistent with ordinary market behavior.

Those swings were not grounded in new information about Cassava. Instead, Cassava had the precise market characteristics that made it an ideal target for meme-stock trading: an unusually large short position, relatively low institutional ownership, and a retail investor base willing to cycle rapidly in and out of positions. Meme traders saw opportunity in squeezing the short interest, and the stock price responded accordingly—sometimes moving by roughly 50% in a single day without any news or disclosures!

Against that backdrop, Plaintiffs filed this securities-fraud class action, alleging misrepresentations about Cassava's clinical development of a drug for the treatment of Alzheimer's disease. The class period spans a time when Cassava was among the most volatile stocks on the Russell 2000, a leading index of the 2,000 smallest public companies. Yet Plaintiffs treated the case as if it involved an ordinary, informationally efficient market. At class certification, their expert submitted a formulaic report reciting indirect indicia of market efficiency—trading volume, exchange listing, and the like—along with a placeholder damages model, without grappling at all with the meme-stock dynamics that dominated Cassava's trading.

That omission matters because reliance is ordinarily an individualized element of a securities-fraud claim—one that would defeat the predominance requirement of Rule 23(b)(3). *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), carved out an exception. When a stock trades in an efficient market, courts may presume that investors relied on the market price as a proxy for all public information, including any alleged misstatements. Most securities-fraud cases that proceed as class actions do so only because of that presumption. But *Basic* rests on two fragile premises: that the market price efficiently incorporates public information, and that investors actually rely on the integrity of that price when trading. When either premise fails, the presumption collapses, individualized reliance issues predominate, and class certification is improper.

The district court nonetheless sidelined meme-stock dynamics at every step of its analysis. It certified a class based on a rinse-and-repeat application of judicially crafted market-efficiency factors while disregarding overwhelming evidence that Cassava's stock traded in a market divorced from informational efficiency. That approach defied this Court's warning that market-efficiency factors are not a "checklist," *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005), and departed from

Judge McFadden's careful analysis of meme-stock dynamics in *Bratya SPRL v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34 (D.D.C. 2024). In reasoning and effect, the district court's decision transforms *Basic*'s rebuttable presumption into a categorical rule; if a court could presume reliance on this record of stark inefficiencies, it is hard to imagine a case where *Basic* would not apply.

The district court also ignored that, even if the market were efficient, Defendants may rebut the presumption of reliance by showing that particular investors did not rely on the "integrity of the market price." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) (*Halliburton II*). This is not a case involving a handful of atypical traders. More than half of Cassava's stock was held by short-term retail investors, including countless meme-stock traders. The defining feature of meme-stock trading is a rejection of the market price's integrity, as maintained by institutional investors, arbitrageurs, and analysts whose trading ordinarily enforces informational efficiency. If there were ever a case in which individualized rebuttal evidence would overwhelm common issues, this is it.

Further errors downstream from *Basic* pervade the district court's certification order. If most class members did rely on the market price's integrity, then Plaintiffs themselves would be atypical outliers because each traded on social-media buzz or personal misunderstandings about Cassava. Plaintiffs also offered no reliable evidence that they could separate the damages that flow from their liability theory (that alleged misrepresentations supposedly inflated the market price) from meme-stock price volatility. And when Plaintiffs finally attempted to address meme-stock dynamics in reply, the court stonewalled Defendants from rebutting that new evidence via a surreply report, motion to strike, or evidentiary hearing.

Each error further confirms what has been true all along: Plaintiffs did not carry their burden to prove that class treatment is appropriate despite the wild swings in Cassava's market price that were disconnected from new, material information. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). On August 12, 2025, the district court certified the class. On August 26, 2025, Defendants timely filed their petition for

permission to appeal, which this Court granted on October 21, 2025. This Court has jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## ISSUES PRESENTED

1.    Whether Plaintiffs may invoke a classwide presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), when meme-stock dynamics caused extreme, news-free volatility that undercut market efficiency and reflected a lack of investor reliance on the integrity of the market price.

2.    Whether, if a presumption of reliance were available, Plaintiffs—whose trading reflected meme-driven speculation rather than reliance on the market price—satisfy Rule 23's typicality requirement.

3.    Whether Plaintiffs carried their burden to prove predominance under Rule 23 by offering only a placeholder damages model and failing to explain how—given pervasive meme-stock volatility—classwide damages could be calculated consistently with their theory of liability.

4.    Whether the district court abused its discretion by foreclosing Defendants' ability to test Plaintiffs' new reply evidence through a surreply expert report, a motion to exclude, or an evidentiary hearing.

## STATEMENT OF THE CASE

**A.    Cassava becomes a meme stock that experiences massive price swings untethered from news.**

Cassava is a clinical-stage biopharmaceutical company focused on developing simufilam, a potential treatment for Alzheimer's disease and other neurological disorders. After the Food and Drug Administration authorized testing simufilam with humans in 2017, the company proceeded with clinical trials on the drug's safety and efficacy. ROA.6911. Those trials yielded promising but inconclusive early-stage results in early 2021. ROA.6911.

Around the same time, Cassava's stock was swept up in the emerging meme-stock phenomenon—a market craze fueled by armies of retail traders on platforms like Reddit and Twitter, whose collective enthusiasm could send stock prices soaring or collapsing from one day to the next, often untethered from company fundamentals or broader market trends. ROA.6433-6435, 6448-6455. A meme stock can experience extraordinary volatility, divorced from the company's value, because of viral social-media attention from retail investors. ROA.6434. Meme stocks emerged in 2021 with the meteoric rise of stocks with weak fundamentals like GameStop, AMC Entertainment, and BlackBerry. ROA.6450.

7

Retail traders driving the meme-stock craze often sought to profit by squeezing short sellers. Short selling allows an investor to profit from a decline in a security's price. By selling borrowed shares, the investor creates a "short" position—a contractual obligation to replace those shares in the future. The economics are defined by the timing of the cover: If the investor can repurchase the shares for less than the proceeds generated by the initial sale, they retain the surplus as profit. ROA.6441; *see Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008).

If a large percentage of a company's stock has been shorted, an unexpected increase in demand for the stock—by "retail investors" in the case of meme stocks like "GameStop, AMC Entertainment, and other companies"—can squeeze the short position by increasing the market price and pressuring the short seller to buy back the stock to stem its losses. *Sodha v. Golubowski*, 154 F.4th 1019, 1026 (9th Cir. 2025). "The theory behind a short squeeze," the Eleventh Circuit recently observed, "is that, if coordinated purchases of a stock drive its price up, those shorting the stock will be forced to cover their position by buying the very stock they are shorting, creating a positive feedback loop in which the price

continues to rise, affecting increasing numbers of short sellers, who then buy even more of the affected stock, and so on." *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

On January 28, 2021, several brokerages attempted to shield themselves from this frenzy and restricted trading in GameStop and AMC—two meme stocks in which retail investors sought to create a short squeeze through social-media coordination. ROA.6453; *see Jan. 2021 Short Squeeze*, 76 F.4th at 1342. Without GameStop and AMC, retail investors were on the prowl for a new company.

Enter Cassava. On February 2, 2021—less than a week after the trading restrictions were placed on AMC and GameStop—Cassava released interim results from an early clinical trial. ROA.6911. The study lacked a control group, involved a small sample size, and covered a short timeframe. ROA.6911. But Cassava's stock ticker began appearing *1,600 times per day* on Reddit and Twitter. ROA.6552-6553. Retail investors had found their target.

Cassava's stock price was extraordinarily volatile. Between February 3 and 5, 2021, the stock price jumped as high as $117 before closing

at under $45 per share.  ROA.6388.  The price then fluctuated signifi-

cantly (between $32 and $62 per share) until May 2021.



ROA.6389.  The price tripled from $37 to $103 per share by July 13.



ROA.6389.  And the price then dropped to $80 before rebounding to over

$135 by July 28.



ROA.6390.

Because virtually nothing relevant happened during this period other than intense social-media interest, Cassava became a prominent meme stock. ROA.6448-6455. Market analysts, financial media, and professional observers repeatedly described Cassava as a "meme stock," attributing wild volatility to retail-driven speculation. ROA.6455. Its ticker, $SAVA, was among the most frequently mentioned on WallStreet-Bets, a 10-million-member online forum known for fueling meme-stock surges. ROA.6452-6454. In the first half of 2021, only GameStop and AMC—the two paradigmatic meme stocks restricted by brokerages immediately before Cassava's rise—posted greater gains in the Russell 2000. ROA.6451.

Cassava was included in the Solactive Roundhill Meme Stock Index, which defined meme stocks based on social-media activity and short interest. ROA.6454. Roundhill warns potential investors in the associated index fund that "[m]eme [s]tocks often trade untethered from . . . fundamentals, driven instead by speculative fervor, viral momentum and in some instances coordinated buying and selling." *Prospectus, Roundhill Meme Stock ETF (MEME)* (Oct. 7, 2025), https://www.roundhillinvestments.com/assets/pdfs/meme_etf_prospectus.pdf.

The whipsawing of Cassava's stock price shows the wisdom of that warning. *See supra*, at 10-11. From February 3 to 5, the price surged from $60 to $117 before collapsing to $45—all without new value-relevant information. The stock then bounced between $32 and $62 through May, tripled from about $37 to $103 between May 13 and July 13, only to fall back to $80 before spiking again to $135 by July 28. All this zigging and zagging occurred during a time when Plaintiffs' expert found that no statistically significant movements in the stock could be attributed to value-relevant news about Cassava. ROA.6002-6004. Instead, the swings tracked retail trading and social-media activity. ROA.6456-6463.

Some price movements even ran counter to value-relevant infor-
mation. For instance, Cassava released additional data on July 29, 2021,
from an early clinical trial that market analysts described as "positive"
and "better than expected." ROA.6749-6764. Yet the stock plummeted—
falling from $103 that day to $69 the next. ROA.6465-6466.

Retail speculation took on the character of a coordinated crusade.
Viewing institutional short interest as an attack, investors moved in con-
cert to drive the price upward, reinforcing one another through collective
online bravado and defiance. They celebrated as "$SAVA did what hold-
ers were hoping $AMC and $GME [GameStop] would do." ROA.6452.
Others urged the group onward, insisting that they just "need[ed] a piece
of news from $SAVA like a potential partnership announcement . . . to
continue [the] short squeeze, as well as shake off the weak hands & trad-
ers. Stay strong & long." ROA.6453. And they turned hostile toward
dissent, demanding: "Why can't these shorties accept their defeat and
just ***k off?" ROA.6720. Amid the frenzy, many reveled in the imag-
ined downfall of professional investors, exulting that "[s]horts have given
us an opportunity of a life time and to you shorty I am grateful! Thank
you and now burn." ROA.6721.

**B.  Plaintiffs claim securities fraud following allegations of data inconsistencies.**

Amid this volatility in August 2021, short sellers filed a citizen petition alleging anomalies in Cassava's scientific data and asking the FDA to halt ongoing late-stage clinical trials.   ROA.4821; *see* 21 C.F.R. § 10.25(a).  Plaintiffs soon filed this action, repackaging the petition's allegations.   ROA.60.   The FDA denied the citizen petition in February 2022.  ROA.6482.  And Cassava later settled negligence-based disclosure charges with the Securities and Exchange Commission in 2024. ROA.5427.

Plaintiffs allege that Cassava misled investors about simufilam by overstating results and concealing data irregularities tied to outside consultant Dr. Hoau-Yan Wang.   ROA.4818.   The Department of Justice charged Wang with fraud, but the government saw its case collapse at trial and agreed to dismissal with prejudice once Wang exposed that the government had withheld exculpatory evidence from the defense. Dkt. 118, 143, *United States v. Wang*, No. 8:24-cr-00211 (D. Md.).  Cassava has consistently denied wrongdoing, emphasized that it is a genuine clinical-stage company pursuing a difficult goal in an area of immense

unmet need, cooperated with regulators, and attributed sharp stock swings to social-media speculation rather than fraud. ROA.5427.

The district court certified Mohammad Bozorgi as lead plaintiff because he had "the largest financial interest in the litigation" and met the other PSLRA requirements. ROA.1258. Mr. Bozorgi was a retail investor who had recently moved to the United States, bet erratically on meme stocks, and lost over $1,500,000 day-trading his family's savings. ROA.736. The two other named plaintiffs, Kenneth Calderone and Manohar Rao, similarly engaged in unusually aggressive, short-term speculation in Cassava securities. ROA.6644-6649, 6691-6692.

## C.   Plaintiffs seek to certify a class while disregarding the effect of Cassava's meme-stock status.

In March 2024, Plaintiffs moved to certify the class. ROA.2824-2851. They invoked *Basic*'s fraud-on-the-market doctrine, which allows plaintiffs to avoid proving that each individual investor read and relied on the alleged misstatements—an inquiry that would overwhelm common issues and prevent class treatment under Rule 23's predominance requirement. 485 U.S. at 244-45. Courts presume that investors relied on the integrity of the market price, but only when the market efficiently

incorporates all publicly available material information, including any misrepresentations, into the price. *Id.* at 246-47.

To establish market efficiency—and by extension predominance—Plaintiffs and their expert, Dr. Steven Feinstein, relied exclusively on a checklist of judicially created factors for evaluating market efficiency. ROA.2824-2856, 3038-3102. But Plaintiffs did not address the defining feature of this case: that meme-stock dynamics drove Cassava's stock during large portions of the class period. As described above, Cassava's stock exhibited extreme volatility untethered from any value-relevant news and instead correlated with viral social-media activity encouraging retail speculation. ROA.6448-6455. Plaintiffs ignored this dynamic, failing to mention the massive price swings that occurred in the absence of news or the role of platforms like Reddit and Twitter in fueling Cassava's trading. ROA.2824-2856, 3038-3102.

Defendants opposed class certification, supported by an expert report from Dr. Rene Stulz. ROA.6371-6416, 6424-6515. Dr. Stulz explained that Cassava's price movements were inconsistent with market efficiency, as many swings occurred without any new information and were correlated with social-media activity. ROA.6456-6565. Throughout

2021, Cassava's stock routinely experienced extreme price and volume spikes wholly divorced from any value-relevant information, lurching between double-digit losses (*e.g.*, 35%) and gains (*e.g.*, 45%). ROA.6460-6465. On November 2, 2021, for example, the market received no new value-relevant information about Cassava, yet nearly 28 million shares traded—out of roughly 40 million outstanding—and the stock inexplicably surged 20%. This date saw one of the highest levels of social-media activity around Cassava. ROA.6457.

Anticipating that Plaintiffs would submit additional expert reports, Defendants stated their intent to file a *Daubert* motion challenging Dr. Feinstein's methodology. ROA.6393. That prediction landed: For the first time in their expert's rebuttal report, Plaintiffs tried to explain away these repeated instances of market-leading volatility—on days with no news but extreme social-media activity—as "random chance." ROA.4234, 4237. Plaintiffs also vowed that they would move to exclude under *Daubert* any further report from Dr. Stulz that addressed their new assertions. ROA.4046.

**D.    The district court restricts Defendants' ability to respond to Plaintiffs' new evidence.**

Within a week of Plaintiffs' reply, Defendants sought leave to file a surreply, explaining that they were entitled to respond to the extensive new evidence.    ROA.4451-4454, 4505-4512.    The magistrate judge granted leave to file a surreply but prohibited the submission of any new evidence.  ROA.4528-4531.  At that point, Dr. Stulz had already prepared a draft surreply report.

Defendants filed their surreply on October 4, 2024.  ROA.4574-4599.  Defendants also requested an evidentiary hearing, attaching Dr. Stulz's surreply report to inform the district court's decision whether to hold a hearing.  ROA.4599.  Plaintiffs didn't oppose the request for a hearing, ROA.4530, but moved to strike Dr. Stulz's surreply report or, in the alternative, to admit a further report from Dr. Feinstein, ROA.4641-4648.  On October 24, the magistrate judge struck Dr. Stulz's report in its entirety.  ROA.4724-4726.

Before either side could file ripe *Daubert* motions, the magistrate judge issued a report and recommendation to grant class certification and deny Defendants' request for an evidentiary hearing.  ROA.5065-5100.  Defendants subsequently filed their *Daubert* motion to strike Dr.

18

Feinstein's report and timely objected to the report and recommendation. ROA.5154-5196.    Plaintiffs moved to strike the *Daubert* motion. ROA.5197-5204.

### E.    The district court certifies the class.

Initially, the district court denied Plaintiffs' motion for class certification without prejudice, citing a pending motion to amend the complaint and the unresolved motion to strike.  ROA.5464-5466.  The court later granted both motions and instructed Plaintiffs to "refile their Motion for Class Certification within 30 days."  ROA.5513-5524.  The court directed that the new filing "shall solely be to incorporate the existing class certification briefing" and that "[n]o new arguments, evidence, or nonexisting briefing shall be filed by any parties."  ROA.5524.

Plaintiffs filed a Second Supplemented Complaint and a renewed motion for class certification that reproduced their original motion verbatim.  ROA.5548-5577.  Defendants filed a short opposition that incorporated all prior filings by reference.  ROA.6208-6209.  The district court then granted Plaintiffs' renewed motion for class certification, adopting in full the magistrate judge's report and recommendation.  ROA.6232-6282.

The district court held that individualized reliance issues would not predominate over common issues. ROA.6253-6261. The court accepted Plaintiffs' contention that Cassava stock traded in an efficient market, marching through judge-made factors that can help analyze market efficiency. ROA.6253-6261. The court did not engage with the economic realities of Cassava's trading environment—one marked by extreme volatility, retail-driven speculation, and sharp price swings unmoored from value-relevant information. ROA.6261. Nor did it grapple with Defendants' showing that these meme-stock dynamics undermined any presumption that investors relied on the integrity of an efficient market price. ROA.6261.

In finding that common issues predominated, the district court also accepted Plaintiffs' vague commitment to calculate damages in the future using an "out-of-pocket" method, which estimates the difference between the price paid and the price that would have prevailed absent the alleged fraud. ROA.5818-5822; *see* ROA.6277-6279. The court did not address Defendants' argument that Dr. Feinstein's proposed means of calculation failed to isolate losses attributable to the alleged misstatements from price movements caused by broader meme-stock volatility and thus was

not consistent with Plaintiffs' liability theory. ROA.6277-6279. Instead, the court treated the undetailed out-of-pocket damages framework as a standard approach routinely accepted in securities cases—without confronting whether this case's unusual market dynamics made such a framework ill suited to the task. ROA.6404-6410.

The district court further held that Plaintiffs—retail investors who engaged in short-term, high-risk trades—satisfied the typicality requirement of Rule 23(a)(3). ROA.6248-6252. On the premise that their unusual trading behavior would affect only the calculation of damages, the court rejected Defendants' contention that the Plaintiffs were atypical for purposes of proving reliance on the alleged misrepresentations. ROA.6250-6251. The court did not examine whether the Plaintiffs had offered any evidence that they relied on the market price's integrity in trading Cassava securities.

This Court granted immediate review of the district court's class-certification order under Rule 23(f). ROA.6364.

## SUMMARY OF THE ARGUMENT

**I.**   Individualized reliance issues predominate over common issues because Plaintiffs will be unable to prove their claims through the classwide presumption of reliance recognized in *Basic*.

The *Basic* presumption cannot apply unless Cassava securities traded in an efficient market *and* investors traded in reliance on the integrity of the market price.   In evaluating market efficiency, most courts consider the *Cammer/Krogman* factors, which include trading volume, the number of market makers, and the cause-and-effect relationship between the release of new, material information and the security's price.   But market efficiency is not "binary."   *Halliburton II*, 573 U.S. at 272.   And this Court has warned that district courts may not use these factors as a "checklist" without digging into whether the market actually was efficient throughout the class period.   *Unger*, 401 F.3d at 325.

The district court used an impermissible checklist approach for market efficiency.   Crediting Plaintiffs' formulaic application of the *Cammer/ Krogman* factors, the court put meme-stock dynamics "legally" off limits, refusing to consider coordinated retail trading and the resulting extreme price volatility in the absence of new information.   ROA.6261.   But those

22

dynamics scrambled the factors, turning some from indicia of efficiency to indicia of inefficiency and neutering others of their probative value. The court also ignored the severe constraints on short selling that are compelling evidence of inefficiency under the more nuanced analysis that *Unger* requires. *E.g.*, *Bratya*, 752 F. Supp. 3d at 59. Because Plaintiffs did not carry their burden to prove market efficiency through sound evidence that persuasively addresses these dynamics, this Court should reverse.

Even if the market was efficient throughout the class period, Plaintiffs still cannot prove their claims through the *Basic* presumption because around 60% of class members were short-term, retail investors who will be subject to individualized rebuttal evidence. Defendants can rebut the presumption by showing that meme-stock traders did not rely on the integrity of the market price and in fact aimed to undermine it. In routine cases, a defendant's ability to "attempt to pick off the occasional class member here or there through individualized rebuttal" does not defeat predominance. *Halliburton II*, 573 U.S. at 276. But meme traders were anything but occasional in this case—and so individualized rebuttal will swamp common issues.

**II.**    If the class *can* rely on the *Basic* presumption, then Plaintiffs are atypical class representatives because they *can't*.  Each made erratic short-term trades in an effort to capitalize on perceived short-term inefficiencies in the market for Cassava securities.  And to the extent that they could explain their decisions at all, they traded based on their factually unsupported views of Cassava's fundamentals—not in reliance on the integrity of the market price.  Plaintiffs are either typical of the class (meaning that individualized issues will predominate) or atypical because they will face individualized rebuttal evidence based on their "peculiar" trading histories.  *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984).

**III.**    Independently, this Court should reverse because Plaintiffs did not establish that their damages model aligns with their theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

Plaintiffs fall short first for the simple reason that they presented a placeholder model that ignores all the factual complications of this case. While intoning the label "out-of-pocket damages," they offered no case-specific methodology capable of isolating fraud-related inflation from other price inflation on a classwide basis.  *Comcast* demands more than

a mere "'preliminary overview of how [class] damages might be calculated.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020).

If a promise to make a model in the future could ever be enough at class certification, Plaintiffs' threadbare evidence confirms the absence of a reliable methodology here. Their expert said that he would calculate out-of-pocket damages by working backwards from each alleged corrective disclosure and estimating the amount of price inflation attributable to alleged misrepresentations. But that approach would imply that Cassava's stock price would have been *negative* if the challenged statements had never been made—an impossible result. Plaintiffs cannot secure class certification by vowing to implement a vague damages model that, from all appearances, will be deeply unreliable.

**IV.** If this Court does not reverse, the Court should at least vacate the class-certification order because the district court repeatedly short-circuited the adversarial process after Plaintiffs filed extensive, new rebuttal evidence with their reply. The court struck Defendants' surreply expert report, refused to consider their *Daubert* motion, and denied an evidentiary hearing—leaving Plaintiffs' newly minted expert opinions

entirely untested. Those one-sided procedural rulings contravene this Court's requirement that defendants receive a fair opportunity to subject new evidence to the rigorous analysis that Rule 23 demands. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774-75 (5th Cir. 2024).

## STANDARD OF REVIEW

This Court reviews class-certification orders for an abuse of discretion. *Unger*, 401 F.3d at 320. The Court ensures that the district court "'rigorously analyze[d] Rule 23's prerequisites,'" including by assessing "'the claims, defenses, relevant facts, and applicable substantive law'" and "consider[ing] 'how a trial on the merits would be conducted' if the class were certified." *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021). When the district court "premises its legal analysis on an erroneous understanding of the governing law," it necessarily "has abused its discretion" because courts never have discretion to get the law wrong. *Unger*, 401 F.3d at 320.

## ARGUMENT

Class actions are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  To justify such an exception, a plaintiff must go beyond "mere pleading" and "affirmatively demonstrate" compliance with each of Rule 23's requirements.  *Id.* at 350. That burden is "demanding," particularly where—as here—plaintiffs seek to avoid individualized reliance issues and proceed under Rule 23(b)(3)'s predominance requirement.  *Comcast*, 569 U.S. at 34. Plaintiffs must also establish that their claims "are typical of the claims . . . of the class," Fed. R. Civ. P. 23(a)(3), which is not the case if they would face unique defenses that undermine their loyalty to the class. These are "stringent requirements for certification that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013).

The district court committed numerous errors in forgoing a "'rigorous analysis'" of whether Plaintiffs proved compliance with Rule 23. *Dukes*, 564 U.S. at 351.  The court relieved Plaintiffs of their burden of proving market efficiency, overlooked Defendants' ability to rebut any presumption of reliance against meme-stock traders, and allowed the class to proceed with highly atypical class representatives.  And in blocking Defendants from responding to Plaintiffs' new reply report through a

surreply report, *Daubert* motion, or evidentiary hearing, the court skewed the adversarial process and ensured an incomplete record.

## I.   Plaintiffs cannot establish their claims through a classwide presumption of reliance because meme-stock dynamics plagued Cassava's securities.

The class-certification order rests on a flawed premise: that Cassava's stock traded in an efficient market during the class period, despite overwhelming evidence to the contrary. To sidestep individualized reliance issues that would defeat the predominance requirement, Plaintiffs invoked *Basic*'s fraud-on-the-market doctrine, which presumes that investors in an efficient market rely on the market price as a proxy for all public information about a company. But that presumption is available only if the market was efficient—meaning that the stock price reflected all publicly available, value-relevant information—*and* if most investors in fact relied on the market price's integrity. The district court erred in disregarding evidence that meme-stock dynamics afflicted Cassava's securities, which experienced price movements that were untethered from new information and inexplicable except by substantial trading activity that did not rely on the price's integrity.

**A.     Courts can presume reliance only when the market price efficiently incorporates public information and most investors rely on the integrity of the market price.**

The district court lacked authority to certify a damages class unless "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry "begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (*Halliburton I*).  As the district court recognized, Plaintiffs' claims against all Defendants require the proof of a violation of § 10(b) of the Securities Exchange Act of 1934, as implemented by Securities and Exchange Commission Rule 10b-5.  ROA.6255-6256.

Neither § 10(b) nor Rule 10b-5 creates a cause of action.  But the Supreme Court has inferred from those provisions that plaintiffs may recover damages in certain circumstances for securities fraud.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975).  Plaintiffs must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Amgen Inc.*

*v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460-61 (2013). The reliance requirement is critical to guarantee "a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Halliburton I*, 563 U.S. at 810.

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction"—here, buying Cassava stock or options—"based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810. But when "reliance is an issue that will have to be proven by each plaintiff," then "the proposed class fails Rule 23(b)(3)'s predominance requirement." *Unger*, 401 F.3d at 321. Recognition that individualized proof of reliance is incompatible with class certification is a "hallmark in this court's class action jurisprudence." *Elson v. Black*, 56 F.4th 1002, 1007 (5th Cir. 2023); *see, e.g.*, *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 383 (5th Cir. 2007); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 310 (5th Cir. 2005).

Because individualized reliance cannot be proved on a classwide basis, the Supreme Court in *Basic* recognized an indirect way for securities plaintiffs to prove reliance: the fraud-on-the-market theory. 485 U.S. at

241-42.  That theory rests on "two premises" about markets and investors.  *Halliburton II*, 573 U.S. at 270.  The first premise is that efficient capital markets incorporate all material public information about a company, so any material misrepresentation necessarily will affect a security's market price.  *Basic*, 485 U.S. at 246.  In an efficient market, misrepresentations that obscure positive information could make a stock "artificially underpriced," *id.* at 249, while misrepresentations that obscure negative information could make a stock "artificially inflated," *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 120 (2021).  The second premise is that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price" and so indirectly relies on any misrepresentation that has been baked into the market price.  *Basic*, 485 U.S. at 247.

*Basic* relied on those twin premises to create a "presumption of reliance" if the plaintiff can prove "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth

was revealed." *Halliburton II*, 573 U.S. at 268. But *Basic* made clear that the presumption of reliance is just that—a presumption.

Plaintiffs can't invoke the presumption unless they prove "the publicity and market efficiency prerequisites . . . *before* class certification." *Halliburton II*, 573 U.S. at 283 (emphasis added). This Court has identified factors that can help "determine whether a stock traded in an 'efficient market': (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 [for actively traded and widely followed stock] (as opposed to Form S-1 or S-2); (5) the existence of empirical facts 'showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price'; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock." *Unger*, 401 F.3d at 323 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)). The district court called these

32

considerations the "*Cammer*/*Krogman* factors" in homage of the district-court decisions that articulated them. *E.g.*, ROA.6260.

This Court has cautioned, however, that district courts should rely on each factor only insofar as the factor bears on market efficiency—the extent to which "the price of a company's stock is determined by the available material information regarding the company and its business." *Unger*, 401 F.3d at 322 (quoting *Basic*, 485 U.S. at 241-42). District courts should avoid the temptation to use the factors "as a checklist rather than an analytical tool." *Id.* at 325. The judge-made factors "must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." *Id.* at 323. As a result, the plaintiff's expert can't simply march through *Cammer*/*Krogman* factors that are "indirect indicia of market efficiency for a particular security," *In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017), without addressing whether the market was, in fact, efficient.

Plaintiffs also must "show market efficiency *throughout the class period*." *Bell*, 422 F.3d at 316 (emphasis added). It would be "nonsense" to allow a class member who traded in an inefficient market to rely on a presumption of reliance just because "a market was generally efficient"

33

at some other time. *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *31 (S.D. Fla. Nov. 13, 2023). If the market was inefficient during even only portions of the class period, class members who bought in those windows can't rely on any presumption of reliance.

That showing of market efficiency throughout the class period must rest on persuasive evidence, not assumption or supposition. Because Rule 23 is not a "mere pleading standard," the plaintiff "must affirmatively demonstrate" compliance with the predominance requirement. *Dukes*, 564 U.S. at 350. This Court was ahead of the *Dukes* curve in stressing that courts evaluate proffered proof of efficiency under a "rigorous" standard. *Unger*, 401 F.3d at 322. So when a plaintiff seeks to avoid proving reliance through traditional, direct means, "a careful certification inquiry is required and findings must be made based on adequate admissible evidence to justify class certification." *Bell*, 422 F.3d at 312-13 (quoting *Unger*, 401 F.3d at 319).

Even when the plaintiff affirmatively proves that the market efficiently incorporated public information during the relevant period, class certification is not automatic. Both "constituent presumptions"—that the market price reflects any misrepresentation and that investors relied on

34

the market price as a proxy for all material public information—are rebuttable through "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Halliburton II*, 573 U.S. at 279, 281 (quoting *Basic*, 485 U.S. at 248). Defendants can rebut the first presumption through evidence of a lack of "price impact"—that the alleged misrepresentation had no effect on the market price. *Id.* at 279-81. And (relevant here) defendants can rebut the second presumption through individualized evidence that an investor "did not rely on the integrity of the market price in trading stock." *Id.* at 276.

Either the plaintiff's failure to prove the prerequisites for the presumption or the defendant's rebutting of the presumption is fatal at class certification. Again, without the *Basic* presumption, the plaintiff would have to prove "individualized reliance" for every class member, "overwhelm[ing] the common [issues]" in the case. *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 242). The district court's certification order hinges on Plaintiffs' ability to prove their claims on a classwide basis through a presumption of reliance. They cannot do so because the record shows that Cassava's price repeatedly moved without—and even

contrary to—value-relevant news, reflecting a market environment incompatible with *Basic*.

## B. The district court erred in disregarding meme-stock dynamics when applying a presumption of reliance.

The district court applied *Basic*'s presumption of reliance without meaningfully grappling with the meme-stock dynamics that dominated Cassava's trading during the class period. Instead, it mechanically marched through the *Cammer*/*Krogman* factors while treating extreme, news-free volatility as legally irrelevant. That approach was erroneous. Meme-stock dynamics undermine both premises on which *Basic* rests: They prevent market prices from efficiently incorporating public information, and they reflect trading by investors who do not rely on—indeed, often seek to erode—the integrity of the market price.

### 1. Plaintiffs neglected their burden to reconcile Cassava's wild price swings with the efficient market hypothesis.

Plaintiffs didn't prove that the market for Cassava's securities efficiently incorporated material information. Throughout the class period, the market price bounced up and down because of coordinated retail trading motivated by viral social-media activity, not new value-relevant information about Cassava. Severe constraints also prevented

conventional investors from acting in response to material information. The district court couldn't cast aside the most compelling evidence against the market's efficiency just because these meme-stock dynamics didn't fit neatly into factors that two other district judges formulated decades ago.

a.    The "central premise" of *Basic* that investors can be harmed by relying on the market price "holds 'only to the extent that markets efficiently reflect (and thus convey to investors the economic equivalent of) all public information.'" *Bell*, 422 F.3d at 310 n.2.  When a market is efficient, "a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information." *Krogman*, 202 F.R.D. at 477; *see* ROA.6440.  Meme stocks can invert those dynamics, experiencing wild swings in the absence of news and changing slowly (or not at all) as the market receives new, value-relevant information.

Meme stocks often involve so-called short squeezes: attempts by retail investors to pressure short sellers to buy back the stock, triggering a cascade of repurchases that push the stock price higher and higher.  *Jan. 2021 Short Squeeze*, 76 F.4th at 1343; *see supra*, at 8-9.  Those dynamics

can make otherwise efficient markets inefficient for a period.  ROA.6449; *see Bratya*, 752 F. Supp. 3d at 56-57.  For example, a short squeeze accomplished through social-media coordination results in an "artificial price" that rises because informed investors can no longer discipline the market price downward in line with publicly available information.  *In re Overstock Sec. Litig.*, 119 F.4th 787, 802 (10th Cir. 2024).  Courts "cannot simply ignore these dynamics . . . in determining whether [a] market was efficient."  *Bratya*, 752 F. Supp. 3d at 58.

Courts are not the only ones to recognize that coordinated meme trading can "distort market dynamics and undermine fair and efficient price discovery mechanisms."  ROA.6700.  Experts at the Securities and Exchange Commission have concluded that meme-stock dynamics can "raise[] questions of market efficiency."  SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021* 30 (Oct. 14, 2021) (SEC Staff Report), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.  Scholars, too, have recognized that "coordinated retail risk" (*i.e.*, social-media coordination of retail investors) creates a "decreased likelihood that stock prices move to reflect information" about the company.  Sue S. Guan, *Meme Investors*

38

*and Retail Risk*, 63 B.C. L. Rev. 2051, 2083 (2022); *see* ROA.6449. In fact, Eugene Fama—the academic who later won the Nobel Prize for research on efficient markets that undergirds the *Basic* presumption of reliance, *see Cammer*, 711 F. Supp. at 1280 n.25—has opined that the market for a meme stock (GameStop) became "very inefficient." ROA.6450 (emphasis omitted).

     **b.**    Cassava had the telltale market characteristics of a meme stock. The short interest (percentage of total shares held in a short position) averaged 23% for the class period and peaked above 30% twice between 2021 and 2022, placing Cassava well above the 90th percentile (15.32%) and at times above the 99th percentile (30.49%) for short interest. ROA.6467. Consistent with a short squeeze, the market price for Cassava stock saw an astonishing 1,800% increase from $7.09 to $135.30 in the first seven months of 2021, gains that lagged behind only the two paradigmatic meme stocks, GameStop and AMC. ROA.6454. Mentions of Cassava exploded on Reddit and Twitter throughout 2021 and 2022, including "discussions of short squeezes." ROA.6452-6453. Because of the volatile price swings and coordination through social media, the Solactive Roundhill Meme Stock Index tracked Cassava along with other

meme stocks, and *Bloomberg*, *Financial Times*, *Business Insider*, and *MarketWatch* all called Cassava a meme stock. ROA.6451, 6454; *see* ROA.6562-6569.

Even though retail-investor coordination can impede informational efficiency, the district court discarded that evidence as legally irrelevant and mechanically applied the *Cammer*/*Krogman* factors using a "'binary' view of market efficiency" the Supreme Court has disavowed. *Halliburton II*, 573 U.S. at 272. "*Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof"—not a matter of destiny. *Id.* Meme-stock dynamics turn multiple *Cammer*/*Krogman* factors on their heads, and the district court could not ignore that reality in favor of a "checklist" approach. *Unger*, 401 F.3d at 325.

***Trading volume was irrationally high.*** For a meme stock, the first *Cammer* factor—trading volume—becomes evidence of market inefficiency. Courts often rely on "average weekly trading volume" because substantial activity "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *accord Unger*, 401 F.3d at 324. But as Judge McFadden recently observed, extraordinary trading

volume supports the *opposite* conclusion for meme stocks: "'[E]xplosions in volume during the class period' are likely 'indicia of market inefficiency rather than efficiency.'" *Bratya*, 752 F. Supp. 3d at 57. Unless "new value-relevant information" could explain that explosion, "hyperactive trading volume" indicates that many traders "are reacting to (or participating in) market manipulation." *Id.* at 58.

That's true here: Cassava's trading volume went berserk in a manner untethered from value-relevant information. During the class period, Cassava's stock turned over at an average weekly rate of 49%—roughly what an ordinary U.S. public company trades in an entire year. World Bank, *Stocks Traded, Turnover Ratio of Domestic Shares* (last updated 2025), https://data.worldbank.org/indicator/CM.MKT.TRNR/. And that weekly average understates the frenetic pace. Between February 2 and July 28, 2021, no value-relevant news about Cassava appeared according to Plaintiffs. ROA.3411-3413. Yet on February 3 alone, 54 million shares changed hands—more than the company's 40 million shares outstanding. ROA.5864. Over the next three days, another 47 million, 21 million, and 29 million shares traded respectively. ROA.5864. This frenzy reflected

speculation and social-media hype, not any rational response to (nonexistent) new information.

***Analysts struggled to make informed recommendations.***  Analysts can bolster market efficiency when enough of them review public information about the company and make informed recommendations to buy or sell that help investors make informed trades.  *Cammer*, 711 F. Supp. at 1286.  But during the class period, the number of analysts for Cassava stock dwindled down to two.  ROA.6472.  The analysts who dropped coverage expressed the difficulty of making informed recommendations amid meme-stock volatility, and two that remained had drastically different price targets ($28 versus upwards of $100).  ROA.6472-6473.  If even professional analysts could not make heads or tails of news about Cassava, there's no basis to conclude that the market as a whole was efficiently incorporating public information into the stock price.

***National listing facilitated meme trading.***  Meme stocks also invariably are on national exchanges because retail investors' easy access to the security allows trading coordination that ignores (or even rebels against) new public information about the company.  *See supra*, at 9.  For that reason, the district court's reliance on Cassava's listing "on the

NASDAQ exchange during the Class Period" says nothing about its efficiency during critical portions of the class period. ROA.6266. This Court couldn't have been more clear that "the mere fact that a stock trades on a national exchange"—there, as here, NASDAQ—"does not necessarily indicate that the market for that particular security is efficient." *Bell*, 422 F.3d at 313. To the contrary, "[i]t would be illogical to apply a presumption of reliance merely because a security is traded within a certain whole market without considering the trading characteristics of the individual stock itself." *Id.* at 315 (quoting *Cammer*, 711 F. Supp. at 1281). But that's precisely what the district court did here in shifting its focus from the specific behavior of Cassava's stock to its bare listing on the NASDAQ exchange.

***Short-selling constraints impeded incorporation of information into market price.*** Meme-stock dynamics also frustrate conventional investors' ability to make trades that incorporate new, value-relevant information into the stock price. When a stock trades in an efficient market, market makers and arbitrageurs can "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1287.

The question, then, is whether market makers or arbitrageurs *did* maintain the integrity of the market price as a reflection of public information. On its own, "the mere number of market makers, without further analysis, has little to do with market efficiency." *Bell*, 422 F.3d at 315 (quoting *Unger*, 401 F.3d at 324). Yet the district court turned this factor into an impermissible nose-counting exercise, tallying up "122 market makers active in Cassava stock during the Class Period" without ever confronting their evident inability to drive Cassava's stock price in response to new, value-relevant public information. ROA.6266.

Because the number of market makers alone doesn't speak to market efficiency, courts have scrutinized "constraints on short selling as 'indirect evidence of market inefficiency.'" *Bratya*, 752 F. Supp. 3d at 59 (quoting *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 434 (D. Ariz. 2013)); *see, e.g.*, *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 273-76 (D. Mass. 2006). The market price does not move in response to new information until market makers and arbitrageurs can react through "hair-trigger trading" that pushes the market price to a new equilibrium reflecting all public information about the company. *Bratya*, 752 F. Supp. 3d at 59. Various constraints—the shares available to

borrow are too few, the costs of borrowing are too high, or the risk of shorting is too much to bear during an "'artificial bubble'"—can prevent public information from entering the market price through short selling. *Id.* at 59-60; *see* ROA.6441; SEC Staff Report 30. When arbitrageurs cannot "trad[e] on their negative views of the company," they no longer fulfill their critical "role in aligning prices with information under . . . the efficient capital market hypothesis." *Bratya*, 752 F. Supp. 3d at 59.

Short-selling constraints impeded market efficiency in this case. Cassava experienced off-the-charts short interest during periods in 2021 and 2022 that sometimes exceeded 30%. *See supra*, at 39. Cassava also was in the bottom quartile for percentage of shares held by institutional investors (30%). ROA.6470. And short sellers typically borrow stock from institutional investors. ROA.6469-6470. Because Cassava's utilization rate (short interest divided by the shares owned by institutional investors) exceeded 93% for most of the class period and topped out at 99%, there were few shares left to borrow. ROA.6470. Borrowing costs for Cassava stock also averaged 15% during the class period (already at the 99th percentile) and soared up to 40% in February 2022, 67% in June 2022, and 45% in September 2022. ROA.6471.

The near-total utilization rate and high borrowing costs for Cassava stock were severe constraints on short sellers that undermined market efficiency. *Bratya*, 752 F. Supp. 3d at 59-61 (same conclusion for stock whose "utilization rate was at or near 100 percent" and whose borrowing costs "reached 50 percent"). Yet the district court refused to engage with this evidence, kicking the issue to trial despite its duty to consider "*all* probative evidence" on market efficiency. *Goldman*, 594 U.S. at 122.

**Price movements in fact were erratic.** The lack of "any reliable relationship between changes in [a company's] stock price and news events" likewise "weighs heavily against a finding of market efficiency." *Krogman*, 202 F.R.D. at 477. Plaintiffs' own methodology showed that Cassava's stock price was just as likely to show a statistically significant change on "days with high social-media activity" as on days with news, "suggesting that Cassava's stock price was as frequently moving in the absence of new, value-relevant information" as in response to new public information. ROA.6443; *see* ROA.6457. Cassava also experienced "price movements [that] were random and volatile" during the class period, often in the absence of any material news. *Krogman*, 202 F.R.D. at 477; *see* ROA.6457-6466; *supra*, at 10-11. Because Cassava's stock was

"reacting without any news event, and not reacting with a news event," the market was not "efficient" throughout the class period.  *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *10 (S.D.N.Y. July 3, 2013).

Dr. Feinstein's after-the-fact attempts to recharacterize no-news days as news days further undercut Plaintiffs' attempt to show market efficiency.  Because Cassava's stock experienced large drops on February 3 through February 5 (45.89%, 34%, and 35.22%, respectively), Dr. Feinstein asserted in his reply report that the market was still "processing" Cassava's announcement of certain test results on February 2. ROA.4231-4232.  Plaintiffs can't have it both ways.  An efficient market incorporates new information "almost immediately."  *Unger*, 401 F.3d at 324.  If Plaintiffs' position is that the market took a full trading week to incorporate new information, then that's another reason to reverse.

The lack of price impact strikes another blow against market efficiency.  Defendants can rely on "price impact evidence" not only to "directly rebut[] the [*Basic*] presumption" but also to "counter[] a plaintiff's showing of market efficiency."  *Halliburton II*, 573 U.S. at 280.  Here, Plaintiffs alleged 17 "corrective disclosures"—occasions where the market supposedly learned the truth of the alleged misrepresentations.  Such

corrective disclosures should cause a stock drop as the inflation caused by the alleged misrepresentation dissipates out of the market price. *Goldman*, 594 U.S. at 123.  But a majority (11 of 17) of Plaintiffs' corrective disclosures had no statistically significant effect on the market price. ROA.6489-6497; *see George*, 2013 WL 3357170, at *12 (plaintiffs did not carry burden to prove market efficiency when study showed that market moved "less than 50%" of the time in response to new, material information).

***Options market was even more inefficient.***  Plaintiffs' evidence of market efficiency comes up even shorter for the subset of class members who purchased Cassava options.  ROA.6489-6511.  Because the district court reasoned that an options market is necessarily efficient whenever the stock market is, ROA.6270, its decision was flawed for all the reasons explained above.  But there are further flaws.

When addressing the trading volume for options, Dr. Feinstein relied on *quotes* (which are provided daily even in the absence of trades) rather than actual transaction *prices*.  ROA.5813.  That conflation matters because Cassava options did not trade on more than half of the total available trading days during the class period.  ROA.6484-6486.

Dr. Feinstein also ignored that Cassava options had a wide bid-ask spread, averaging over 40% during the class period and exceeding 100% for some options.  ROA.3069, 6485-6486.  Because the baseline average for options is 20%, these large spreads suggest (as the proof of infrequent trading already shows) that Cassava options were "too expensive to trade," preventing the incorporation of new information into the market price for options.  *Krogman*, 202 F.R.D. at 478.

**c.**  Even though meme-stock dynamics impeded market efficiency and inverted several *Cammer/Krogman* factors, the district court disregarded this evidence as "legally" off limits.  ROA.6261.  The court acknowledged that this Court has not addressed whether *Basic* applies to meme stocks, but it declined to consider the evidence necessary to resolve that novel issue.  ROA.6261.  That decision to shut its eyes to evidence undermining market efficiency has sweeping implications:  It would mean that any stock actively traded on a major exchange—regardless of how irrationally it behaves—automatically qualifies as "efficient" for classwide reliance.  That blanket presumption has no footing in *Basic*.

The district court also erroneously disregarded Dr. Stulz's expert analysis on the ground that he "admitted that he has no evidence

49

Cassava was a meme stock." ROA.6262-6263. Not true: Dr. Stulz explained that, while there is no single academic definition of "meme stock," the phenomenon has been widely studied, is understood to disrupt market efficiency, and captures the trading activity in Cassava securities, which exhibited hallmark features of meme-stock dynamics. ROA.6448-6455, 6459-6466. Like most legal issues, *Basic* is "levelled at the thing" (market inefficiency), "not the name" (meme stock). *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867)). But the public in any event widely recognized Cassava as a meme stock. *See supra*, at 11-12.

Because Plaintiffs shirked their burden to address meme-stock dynamics that undermined market efficiency, they shouldn't get "a second bite at the class certification apple." *Bell*, 422 F.3d at 316. Plaintiffs cannot rely on the *Basic* presumption to avoid highly individualized reliance issues. And the class-certification order accordingly cannot stand.

50

## 2. Even if the market was efficient, the large number of class members who did not rely on the integrity of the market price defeats predominance.

Even if Plaintiffs could establish that Cassava's market was efficient throughout the class period, they still do not satisfy the predominance requirement. *Basic* rests on a presumption "that *most* investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *Halliburton II*, 573 U.S. at 273 (quoting *Amgen*, 568 U.S. at 462). But Defendants must be given an "opportunity to rebut" that presumption as to individual meme traders "by showing that [they] did not rely on the integrity of the market price in trading stock." *Id.* at 276. Far from relying on the market price's integrity, the typical meme trader coordinates through social media in an effort to undermine its integrity.

Meme-stock dynamics occur when a large contingent of investors "are purchasing and selling stocks without believing that the market is efficient and that market price signals are meaningful and are making investment decisions without regard to market prices." Christine Hurt

& Paul Stancil, *Short Sellers, Short Squeezes, and Securities Fraud*, 47 J. Corp. L. 106, 117-18 (2021). Two main possibilities explain the intent behind meme trading. One: The meme trader did not believe in the integrity of the market price and thought that buying the stock would overcome the manipulation of short sellers that kept the price artificially low. ROA.6720-6721. Or two: The investor aimed to manipulate the market price by coordinating purchases that would artificially inflate the price. ROA.6452.

Either way, Defendants have a strong basis to rebut the *Basic* presumption because the meme traders in the class did not "make investment decisions based upon *price and price alone*." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015). Their motivation to buy Cassava stock sprung from "something other than price": viral social-media encouragement and an outsized short position. *Id.* And their goal of targeting Cassava's short position likely made many meme traders "completely indifferent" to the substance of the purported fraud—allegedly overstating the probability that Cassava would be able to bring an Alzheimer's drug to market—so long as they could force the short sellers to blink first and cover their positions. *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F.

Supp. 3d 424, 437-38 (S.D.N.Y. 2015).  The Third Circuit reached a similar conclusion for short sellers who did not "rel[y] on the integrity of the market *price* in that stock." *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 823 (3d Cir. 1988).  Retail-investor coordination to combat a short position is equally detached from reliance on the integrity of the market price.

The sheer number of meme traders in the class prevents Plaintiffs from demonstrating that common issues will predominate over the individualized issue whether class members relied on the market price's integrity.  Although the fact that a "defendant might attempt to pick off the occasional class member here or there through individualized rebuttal" does not alone doom certification, *Halliburton II*, 573 U.S. at 276, the certified class here contains far more than the occasional class member who would be subject to individualized rebuttal because meme-stock dynamics drove Cassava's stock price through a significant portion of the class period, *see supra*, at 10-11.  Short-term, retail traders held 60% of Cassava's stock during the class period.  ROA.6451-6452.  At the class-certification stage, the presence of a significant contingent of class members who likely didn't rely on the integrity of the market price causes individualized issues to predominate over common ones.  *E.g.*, *In re*

*Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) (vacating class certification for lack of predominance because many class members were aware of artificial inflation of stock price).

Any class proceeding would quickly devolve into an endless series of minitrials because Defendants have a right to raise individualized rebuttal defenses for potentially 60% of class members. Under the Rules Enabling Act, Rule 23 cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). The district court thus could not certify the class "on the premise that [Defendants] will not be entitled to litigate" defenses affecting "individual claims." *Dukes*, 564 U.S. at 367. Because meme-stock dynamics undercut both *Basic* premises, Plaintiffs will not be able to prove their claims without individualized reliance issues overwhelming common issues.

## II.     If most class members relied on the integrity of the market price, then Plaintiffs are atypical class representatives.

The *Basic* presumption puts Plaintiffs in a bind for the typicality requirement. As just discussed, Defendants maintain that, even if the market was efficient, individualized issues would predominate over common ones because most class members are retail investors who would be subject to individualized rebuttal as to whether they relied on the market

price's integrity.  But if Plaintiffs try to salvage a classwide presumption of reliance on the theory that most class members indeed did rely on the market price's integrity, they would be sacrificing their ability to establish typicality because their own trading history rebuts the presumption of reliance for themselves.

Rule 23 does not allow any class to be certified unless Plaintiffs' "claims or defenses" are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  As the district court acknowledged, the typicality requirement depends on "the similarity of legal and remedial theories" for the named plaintiffs' and unnamed class members' claims.  ROA.6249 (quoting *Ibe v. Jones*, 836 F.3d 516, 528-29 (5th Cir. 2016)).  A crucial consideration is whether "representation of the class will suffer if the named plaintiff is preoccupied with a defense which is applicable only to himself"—including, for example, a lack-of-reliance defense in a securities-fraud case that arises from a "characteristic peculiar to the named plaintiff."  *Warren*, 728 F.2d at 747.

None of the three Plaintiffs satisfies the typicality requirement.  If one assumes for the sake of argument that unnamed class members can rely on the *Basic* presumption of reliance, the legal theory underlying

Plaintiffs' claims will sharply depart from the rest of the class because Plaintiffs cannot take advantage of the *Basic* presumption or at minimum will be preoccupied responding to individualized rebuttal evidence concerning their own trades that in no sense relied on the integrity of the market price for Cassava securities.

***Mohammad Bozorgi.***  Mr. Bozorgi moved from Iran to the United States in 2020 to try his luck on the stock market with his life savings, as well as his siblings'.  ROA.6605-6608.  He opened a margin account at HSBC and began rapidly cycling through large positions in meme stocks while taking losses.  ROA.6610-6612.  This erratic trading was a trend: Mr. Bozorgi bought and sold millions of dollars in stock every week while his losses mounted.  ROA.759.

Mr. Bozorgi's investments in Cassava followed this same pattern. ROA.759.  Between late June and August of 2021, he frequently and repeatedly turned over large positions in Cassava stock, buying and selling nearly $15 million—more than seven times the value of his entire portfolio.  He often bought and sold up to 25,000 shares in Cassava stock (sometimes exceeding $1 million) within days or even on the same day. ROA.6614-6618.  During his deposition, Mr. Bozorgi could offer no

rational explanation for these trades—neither reliance on the market price's integrity nor reaction to news about Cassava.  ROA.6615.  HSBC ultimately liquidated Mr. Bozorgi's position and closed his account "because of the high volatility and high margin calls" generated by his erratic trading activity.  ROA.6629-6630, 6884-6886.

***Kenneth Calderone.***  Mr. Calderone was an active trader in 2021, self-managing his savings.  He employed a trading strategy of buying stocks with an intent to sell them within a month or less to take profits, and actively traded substantial portions of his portfolio in meme stocks.  ROA.6414, 6639-6641.  In June 2021, he overheard a discussion of Cassava stock on a podcast his wife (a day trader) was listening to.  ROA.6644-6646.  Despite his wife's warning that he needed to "be careful" with "high risk" investments, he bought 1,000 shares of Cassava stock for roughly $83,000 without any further diligence.  ROA.6644-6649.

Mr. Calderone then continually bought and sold substantial positions, ultimately buying more than $315,000 and selling more than $420,000 in July 2021, effectively cycling his entire portfolio value in just Cassava shares in a single month.  ROA.6659-6661.  Indeed, on more than one occasion that July, he bought and sold more than $100,000 in

Cassava stock—a substantial portion of his portfolio—in a single day. ROA.6650-6652.

Mr. Calderone has consistently rejected the integrity of the market price as a reflection of all public information about Cassava, including the alleged misrepresentations. During periods of enormous volatility and after the revelation of the supposed fraud on the market, he not only held onto his position of 1,000 Cassava shares because he was betting the stock price would continue to increase, ROA.6656, 6660, but also increased his stake by buying additional shares, including just weeks after this suit was filed and more than a year after that. ROA.6668-6673. To this day, he believes that the stock is undervalued and that its market price will go higher. ROA.6657-6658.

**Manohar Rao.** Mr. Rao employed a similarly risky strategy. He would sell large quantities of put contracts in highly volatile stocks with a strike price (the price at which the buyer has the option to sell the stock back to the seller) far below the stock's current market price. His contracts always expired within a month of sale, and he would often close out the contracts within days of sale. He focused on highly volatile stocks

that were "significantly going up" to collect a "reasonable premium" due to the volatility. ROA.6683-6684, 6686.

In July and August 2021, Mr. Rao aggressively applied this strategy to Cassava options, often selling hundreds of put contracts at a time that would force him to dedicate his entire account to the purchase of Cassava stock if the contracts came due. ROA.6691. In one such trade on August 23, he sold 201 put contracts obligating him to buy 20,100 shares of Cassava stock at $95 per share if the price dropped below that level before August 27, a move that he admitted was "extremely risky" given the stock's performance. ROA.6691-6692. He could not recall doing any diligence on Cassava before these trades and mistakenly believed that the FDA had already approved simufilam—showing that he was not relying on the market price, which in an efficient market would incorporate the information that the FDA hadn't approved simufilam. ROA.6685.

Plaintiffs' trading history reflects reckless, high-volume trading by retail traders seeking to profit from short-term volatility in a meme stock. They did not invest in reliance on the integrity of the market price as a composite for all public information about Cassava. Mr. Bozorgi made

inexplicable short-term trades for massive losses, Mr. Calderone leapt in head first after overhearing a podcast, and Mr. Rao traded in reliance on his own misapprehension that the FDA had approved simufilam. Because Plaintiffs' lack of reliance on the market price's integrity likely reflects the unconventional motivations of other retail traders, this Court should hold that individualized rebuttal defenses predominate over common issues. *See supra*, at 51-54. But this evidence at a minimum "severs the link between the alleged misrepresentation" and Plaintiffs' "decision to trade at a fair market price," *Halliburton II*, 573 U.S. at 269, and thereby renders Plaintiffs atypical representatives of any class that could rely on the presumption of reliance, *Warren*, 728 F.2d at 747.

The district court never even addressed Defendants' core contention below: that Plaintiffs are atypical because their highly volatile trading severs the link between the alleged misrepresentations and their purchases. ROA.6411-6415. Instead, the court stated that "Plaintiffs' damages may be different than some of the Proposed Class." ROA.6250. But individualized rebuttal evidence under *Basic* goes to the heart of Plaintiffs' ability to establish *liability*. 485 U.S. at 248. If Plaintiffs did not rely on the market price's integrity as a proxy for public information

about Cassava, then Plaintiffs will "have to prove that [they] directly relied on the [alleged] misrepresentation[s] in buying or selling" Cassava securities. *Halliburton II*, 573 U.S. at 269. The district court necessarily abused its discretion by failing to address the reliance-based typicality argument that Defendants raised below. *See Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 548 (5th Cir. 2020) (holding that district court abused its discretion by "neglect[ing] to consider asserted differences among class members").

In short, Defendants' right to rebut the presumption of reliance as to Plaintiffs will impose hydraulic pressure redirecting their attention away from establishing issues that are common to the class. Their need to establish individualized reliance specifically on the alleged misrepresentations renders them atypical representatives of any class that could rely on the *Basic* presumption of reliance.

## III. The district court erred in concluding that Plaintiffs could reliably calculate classwide damages consistently with their theory of liability.

This Court need not proceed further if it reverses class certification because individualized reliance issues predominate or because Plaintiffs are atypical class representatives. *See Regents*, 482 F.3d at 394. But

there is another fatal defect.  "Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'"  *Cruson*, 954 F.3d at 258 (quoting *Comcast*, 569 U.S. at 34).  Plaintiffs didn't demonstrate a reliable methodology to calculate damages under *Comcast*.

In *Comcast*, the plaintiffs proposed four theories of antitrust impact.  569 U.S. at 31.  The district court rejected all but one, yet the plaintiffs nonetheless developed a damages model that did not "isolate damages resulting from any one theory."  *Id.* at 32.  The Supreme Court held that plaintiffs cannot meet the predominance requirement by playing fast and loose with damages.  Given the mismatch between the damages model and the remaining theory of antitrust impact, the plaintiffs could not "possibly establish that damages are susceptible of measurement across the entire class," meaning "[q]uestions of individual damage calculations w[ould] inevitably overwhelm questions common to the class."  *Id.* at 34-35.

This Court and others have held that a plaintiff can't secure class certification under *Comcast* by promising to develop a reliable damages

model down the road.  *Cruson*, 954 F.3d at 258; *see, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013). Yet that was Plaintiffs' approach here.  Dr. Feinstein asserted that Plaintiffs will use the out-of-pocket model, under which damages are "measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale or, if held, at the end of the class period, taking into account formulaic prescriptions in relevant case law and statutes."  ROA.3098.  He never explained how he would apply that methodology to the facts of this case.

Such a "'preliminary overview of how [these] damages might be calculated'" is little better than a placeholder and can't support class certification.  *Cruson*, 954 F.3d at 258.  As another court noted in excluding similar testimony from Dr. Feinstein, his approach "is vague, indefinite, and unspecific," and "amounts to 'no damages model at all.'"  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018); *see also In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *11 (E.D.N.Y. Jan. 11, 2022), *adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) (rejecting Dr. Feinstein's opinion as "black box-like, unverifiable, standardless, and subjective").

Even if this Court digs under the hood, what little Plaintiffs have shared about their damages model only raises more red flags. The "principal holding of *Comcast* was that a 'model purporting to serve as evidence of damages . . . must measure only those damages attributable to th[e] theory' of liability on which the class action is premised." *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (quoting *Comcast*, 569 U.S. at 35). Dr. Feinstein promised that he would disaggregate price inflation caused by the alleged fraud "using generally accepted empirical analysis and valuation tools" to show the level of inflation attributable to the alleged misstatement. ROA.3099. But Dr. Feinstein didn't even attempt to show how his methodology would work for this case's unique facts.

Recall that Plaintiffs' theory of liability is that Defendants misrepresented highly technical details in disclosures of preclinical and clinical research during the early stages of simufilam's development. ROA.3809-3832. Measuring damages attributable solely to that theory is particularly challenging given the market forces at play. Cassava's stock was subject to extreme volatility throughout the class period, much of it

64

driven by meme-stock dynamics and retail speculation. ROA.6433-6435, 6448-6455.

Plaintiffs have offered no way to deal with these characteristics. The out-of-pocket approach—calculating inflation at purchase minus inflation at sale—requires estimating inflation on every day of the class period. To do so, Dr. Feinstein proposes working "chronologically backwards" by adding together the amounts of inflation supposedly removed on each alleged corrective-disclosure date. ROA.5821-5822. But that approach cannot be reconciled with Cassava's meme-stock volatility. Cassava's stock soared in early 2021 and then fell sharply that summer after the supposed corrective disclosures. *See supra*, at 10-11. If Dr. Feinstein adds those late-summer declines to estimate earlier inflation before meme trading spiked the stock price, his model implies that Cassava's "but-for" stock price would have been *negative* for much of the first year of the class period. ROA.6437, 6499, 6510-6511.

That impossible result demonstrates that Plaintiffs' (hypothetical) damages model is incapable of "isolat[ing] damages resulting from" the alleged misrepresentations. *Comcast*, 569 U.S. at 32. Because Feinstein's "damages model [i]s prone to false positives" (meaning, it

attributes meme-stock inflation to the alleged fraud), that unreliability "shred[s] the plaintiffs' case for certification." *Rail Freight*, 725 F.3d at 252-53.

To all of this, the district court responded that Plaintiffs had done enough simply by invoking the out-of-pocket damages model. ROA.6279. Selecting a general model sufficed, the court said, because it "is used to compute damages in virtually all securities class actions." ROA.6278. But *Comcast* does not permit plaintiffs merely to name a methodology— it requires that they supply the concrete details of that methodology and demonstrate its fit with their theory of liability. And "plaintiffs cannot avoid this hard look by refusing to provide the specifics of their proposed methodology." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). Allowing Plaintiffs to satisfy *Comcast* with nothing more than a label evades the rigor the Supreme Court demands and leaves predominance resting on an untested assertion rather than an actual, workable classwide model.

## IV. Serious procedural errors mar the class-certification order.

The district court also distorted the record by cutting off Defendants' ability to respond to Plaintiffs' belated attempt to address meme-

stock dynamics in their reply report.  In striking the surreply report, the court allowed Plaintiffs to recast their theory of efficiency without testing its structural integrity through the adversarial process.  The court also abdicated its gatekeeping role by refusing to entertain *Daubert* motions.  And the court insulated the resulting unvetted expert testimony from scrutiny by declining to hold an evidentiary hearing.

To start, the district court abused its discretion by refusing to consider Dr. Stulz's surreply report.  That report responded directly to new expert opinions introduced for the first time in Plaintiffs' reply—namely, Dr. Feinstein's 110-page rebuttal report—which for the first time attempted to address the meme-stock dynamics central to this case.  ROA.4118-4291.  Plaintiffs had barely mentioned those complications in their opening motion.  ROA.2825-2851.  Their reply pivoted to make meme-stock trading a centerpiece of their argument, contending that such volatility was irrelevant to market efficiency and damages—issues on which Dr. Stulz's initial report had focused.  ROA.4036, 4041-4049, 4177-4331 (rebuttal report).  Yet the district court relied on those new opinions in certifying the class while refusing Defendants any opportunity to rebut them.  ROA.6245, 6263, 6265, 6274.

That is exactly the kind of sandbagging this Court forbids. In *Anadarko*, the Court vacated a class-certification order in nearly identical circumstances. The defendants there, as here, sought leave to file a surreply and accompanying expert report to address new expert evidence raised in Plaintiffs' reply. 99 F.4th at 773. The district court denied the motion and certified the class. *Id.* This Court reversed because the defendants were entitled to "'an adequate opportunity to respond'" to new evidence raised at the reply stage. *Id.* at 774. On remand, the district court permitted both the surreply brief and the surreply report. Dkt. 228, *In re Anadarko Petroleum Corp. Sec. Litig.*, No. 4:20-cv-00576 (S.D. Tex.).

The district court further erred by striking Defendants' *Daubert* motion and refusing to conduct a full *Daubert* inquiry before ruling on class certification. Because "[c]lass actions may only be certified 'based on adequate admissible evidence to justify class certification,'" "*Daubert* therefore applies with the same rigor at the class certification stage as at trial." *Anadarko*, 99 F.4th at 774 (quoting *Prantil*, 986 F.3d at 575). This Court held not only that the defendant should have been able to file a surreply with responsive evidence, but also that the district court should have "perform[ed] a full *Daubert* analysis" of the plaintiffs' rebuttal

report. *Id.* at 775. The district court's decision again can't be reconciled with *Anadarko*.

The district court cemented the prejudice by denying Defendants' unopposed request for an evidentiary hearing. This Court has long held "that if there is any doubt as to the propriety of a class action, a preliminary evidentiary hearing on maintainability is essential." *Camper v. Calumet Petrochemicals, Inc.*, 584 F.2d 70, 72 (5th Cir. 1978); *see Merrill v. S. Methodist Univ.*, 806 F.2d 600, 608 (5th Cir. 1986) (collecting decisions "stat[ing] on numerous occasions that the district court should ordinarily conduct an evidentiary hearing on this question [of class certification]"). Here, there was more than "doubt"—there were sharp factual disputes on the core Rule 23 issues, including dueling expert opinions on market efficiency, price impact, and damages. A hearing with live testimony and cross-examination would have allowed Defendants some opportunity, even if a diminished one, to test the reliability of Dr. Feinstein's new reply opinions—for example, that the massive swings in Cassava's stock price were sheer "random chance," *supra*, at 17—after the district court prevented a surreply report or a *Daubert* motion.

Whether considered separately or together, these procedural defects warrant vacatur. Each is a failure to conduct the properly "rigorous" analysis that Rule 23 requires. *Anadarko*, 99 F.4th at 774. And the constant shutting down of Defendants' efforts to respond to new, unreliable evidence was especially consequential given the novel issues at stake. The intersection of meme-stock dynamics and Rule 23's predominance inquiry raises fact-intensive questions demanding particular care and sensitivity. The systematic and one-sided denial of adversarial testing deprived the court of a full factual record and undermines class certification.

## CONCLUSION

This Court should reverse the class-certification order because Plaintiffs did not carry their burden to prove predominance and typicality. At a minimum, the Court should vacate the order, which was tainted by serious procedural errors.

DATED:    January 15, 2026            Respectfully submitted,

 /s/ Gregg Costa
Gregg Costa

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa
gcosta@gibsondunn.com
Lloyd S. Marshall
lmarshall@gibsondunn.com
811 Main St., Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600

Monica K. Loseman
mloseman@gibsondunn.com
Scott Campbell
scampbell@gibsondunn.com
1801 California St.
Denver, CO 80202
Telephone: (303) 298-5700

Brian Richman
brichman@gibsondunn.com
2001 Ross Avenue, Suite 2001
Dallas, TX 75201
Telephone: (214) 698-3100

Patrick J. Fuster
pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

*Counsel for Appellants Cassava
Sciences, Inc. and Eric J. Schoen*

BAKER & HOSTETLER LLP

Douglas W. Greene
dgreene@bakerlaw.com
Zachary R. Taylor
ztaylor@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 847-7090

C. Shawn Cleveland
scleveland@bakerlaw.com
2850 N. Harwood St., Suite 1100
Dallas, TX 75201
Telephone: (214) 210-1210

*Counsel for Appellants Remi Barbier and Lindsay Burns*

## CERTIFICATE OF SERVICE

I certify that, on January 15, 2026, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

*/s/ Gregg Costa*
Gregg Costa

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word for Microsoft 365. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,970 words, excluding the parts exempted by Rule 32(f).

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

*/s/ Gregg Costa*
Gregg Costa