No. 25-50855

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

MOHAMMAD BOZORGI; KEN CALDERONE; MANOHAR K. RAO,
individually and on behalf of all others similarly situated; all persons or
entities who, between September 14, 2020 and October 12, 2023,
purchased or otherwise acquired Cassava Sciences, Inc., securities,

*Plaintiffs-Appellees*

v.

CASSAVA SCIENCES, INCORPORATED; REMI BARBIER; ERIC J. SCHOEN;
LINDSAY BURNS,

*Defendants-Appellants*

On Appeal from the United States District Court for the Western
District of Texas, Austin Division, Case No. 1:21-cv-00751-DAE

## APPELLANTS' REPLY BRIEF

Douglas W. Greene
Zachary R. Taylor
C. Shawn Cleveland
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 847-7090
dgreene@bakerlaw.com

*Counsel for Defendants-
Appellants Remi Barbier and
Lindsay Burns*

Gregg Costa
 *Counsel of Record*
Monica K. Loseman
Scott Campbell
Brian Richman
Lloyd S. Marshall
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
811 Main St., Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
gcosta@gibsondunn.com

*Counsel for Defendants-
Appellants Cassava Sciences, Inc.
and Eric J. Schoen*

**TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................................. ii

Introduction ............................................................................................ 1

Argument ................................................................................................ 4

I.    Plaintiffs' mootness argument does not shield the flawed
      class-certification order from scrutiny. ........................................... 4

II.   Plaintiffs cannot prove their claims through a classwide
      presumption of reliance.................................................................. 8

      A.    Like the district court, Plaintiffs tally up market-
            efficiency factors while ignoring glaring indicators of
            inefficiency...................................................................... 8

      B.    Plaintiffs cannot strip Defendants of their right to
            present individualized rebuttal evidence............................ 18

III.  If the class can rely on a presumption of reliance, Plaintiffs
      are atypical because they did not trade in reliance on the
      market price's integrity.............................................................. 20

IV.   Plaintiffs cannot evade *Comcast* by slapping an "out-of-
      pocket" label on their black-box damages model. ......................... 26

V.    Even on appeal, Plaintiffs continue to capitalize on the
      skewed playing field created by procedural errors. ...................... 30

Conclusion............................................................................................. 34

Certificate of Service ............................................................................ 36

Certificate of Compliance ..................................................................... 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................6, 7

*Angell v. GEICO Advantage Ins. Co.,*
67 F.4th 727 (5th Cir. 2023) ...................................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) .....................................................13

*Basic v. Levinson,*
485 U.S. 224 (1988)....................................................................2

*Bell v. Ascendant Solutions, Inc.,*
422 F.3d 307 (5th Cir. 2005).............................................10, 18

*Bratya SPRL v. Bed Bath & Beyond Corp.,*
752 F. Supp. 3d 34 (D.D.C. 2024).......................2, 11, 12, 14

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013).............................................................26, 27

*Cruson v. Jackson Nat'l Life Ins. Co.,*
954 F.3d 240 (5th Cir. 2020)...................................................28

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
999 F.3d 1247 (11th Cir. 2021).................................................6

*Feder v. Elec. Data Sys. Corp.,*
429 F.3d 125 (5th Cir. 2005)...........................................21, 24, 25, 26

*George v. China Auto. Sys., Inc.,*
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...........................16

*Georgia Firefighters' Pension Fund v. Anadarko
Petroleum Corp.,*
99 F.4th 770 (5th Cir. 2024) ..............................................31, 32

ii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   594 U.S. 113 (2021)..................................................................... 14, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014).................................... 3, 14, 19, 20, 21, 22, 23

*Harris v. Amoco Prod. Co.*,
   768 F.2d 669 (5th Cir. 1985)............................................................. 7

*In re Integra Realty Resources, Inc.*,
   354 F.3d 1246 (10th Cir. 2004)......................................................... 7

*In re Intuitive Surgical Sec. Litig.*,
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)...................................... 17

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   76 F.4th 1335 (11th Cir. 2023) ........................................................ 22

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ..................................................... 16

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)........................................................................ 32

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015)............................................. 18, 27, 28, 29

*Miller v. Thane Int'l, Inc.*,
   615 F.3d 1095 (9th Cir. 2010).......................................................... 17

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999)............................................................ 25

*In re Nexium Antitrust Litig.*,
   778 F.3d 1 (1st Cir. 2015) ................................................................. 5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
  100 F. App'x 296 (5th Cir. 2004) ........................................................ 27

*In re PolyMedica Corp. Sec. Litig.*,
  453 F. Supp. 2d 260 (D. Mass. 2006) .............................................. 14, 15

*Prantil v. Arkema*,
  986 F.3d 570 (5th Cir. 2021) ............................................................ 14

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ............................................................ 13

*Sosna v. Iowa*,
  419 U.S. 393 (1975) .......................................................................... 6

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) .............................................. 2, 10, 12, 17

*In re Vale S.A. Sec. Litig.*,
  2026 WL 1002335 (E.D.N.Y. Apr. 13, 2026) ...................................... 29

*In re Vivendi Universal, S.A. Sec. Litig.*,
  123 F. Supp. 3d 424 (S.D.N.Y. 2015) ................................................ 24

*Warren v. Reserve Fund, Inc.*,
  728 F.2d 741 (5th Cir. 1984) ............................................................ 24

*Zlotnick v. TIE Commc'ns*,
  836 F.2d 818 (3d Cir. 1988) ............................................................ 20

**Rules**

Fed. R. Civ. P. 23(e) ............................................................................ 6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Other Authorities**

Dhruv Aggarwal, Albert H. Choi & Yoon-Ho Alex Lee,
*The Meme Stock Frenzy: Origins and Implications*,
96 S. Cal. L. Rev. 1387 (2024) ...........................................................17

John W. Bagby & Nizan Geslevich Packin,
*Meme-Manipulation: Towards Reinvigorating
the Regulation of Speculative Devices*,
74 Am. U. L. Rev. 1155 (2025)...........................................................19

Newberg & Rubenstein on Class Actions (6th ed. 2022) .........................6

Wright & Miller's Federal Practice & Procedure (3d ed. 1998)................6

## INTRODUCTION

Plaintiffs' response confirms that the class-certification order cannot stand. Even though Cassava Sciences' securities were swept up in the meme-stock craze of 2021, Plaintiffs litigated this case as if Cassava traded in an ordinary market. It did not. Viral social-media interest drove wild price swings untethered from value-relevant information about Cassava. Unsurprisingly, then, Plaintiffs failed to prove that the market price efficiently incorporated public information, that they and absent class members traded in reliance on the market price's integrity, and that their damages model could isolate inflation in the market price that was attributable solely to the alleged misrepresentations.

Trying to evade review, Plaintiffs argue that this appeal is moot because of a settlement agreement under which they'd release Defendants from liability. But Plaintiffs have not dismissed their claims or even moved for approval of a class settlement. And because any future class settlement will hinge on a lawfully certified class, the issues raised on appeal remain as pressing as ever, even if the district court ultimately approves a settlement.

1

On the merits, Plaintiffs do not dispute that predominance rises or falls with their ability to invoke the presumption of reliance for efficient markets that the Supreme Court recognized in *Basic v. Levinson*, 485 U.S. 224 (1988). But Plaintiffs attack arguments Defendants never made. They insist that meme stocks don't categorically trade on inefficient markets and that district courts are allowed to use the *Cammer/Krogman* factors even for highly volatile markets. Defendants never argued otherwise. The district court erred not by considering the factors, but by treating them as a superficial box-checking exercise. Because the factors are not a rote "checklist," the district court should have applied the factors with sensitivity to how meme-stock dynamics can blunt or even flip the indirect inference of market efficiency for certain factors. *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005); *see Bratya SPRL v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34, 57-58 (D.D.C. 2024).

Once Plaintiffs' misdirection is stripped away, their theory of market efficiency implodes. Trading volume was evidence of meme-based speculation, not efficiency. Analysts abandoned coverage or diverged wildly. Short-selling constraints prevented conventional investors from disciplining the market price. Price movements bore no reliable

2

relationship to value-relevant news.  And Plaintiffs themselves concede that the market needed more than a day to incorporate new material information—a prototypical sign of an inefficient market.  If that showing is enough under *Basic*, then market efficiency is effectively automatic, not the "matter of proof" it is supposed to be even for nationally listed stocks.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (*Halliburton II*).

Plaintiffs also wrongly treat market efficiency as the end of the *Basic* inquiry.  Yet even if Cassava's market remained efficient throughout the class period, Defendants can still defeat the presumption by proving that Plaintiffs or absent class members traded for reasons other than the market price's integrity.  Plaintiffs, as consummate meme-stock traders, face a quandary.  If their erratic trading habits are typical of the absent class members, then the *Basic* presumption collapses, and individualized issues of reliance will predominate.  If Plaintiffs alone did not trade in reliance on the integrity of the market price, then they are atypical representatives who have no business leading the class.

Plaintiffs likewise fail to answer Defendants' damages argument.  To establish predominance, Plaintiffs must offer a reliable damages

3

methodology that captures only the harm associated with their liability theory—here, that alleged misrepresentations inflated the market price for Cassava stock and options. Plaintiffs train their fire on the argument that their expert was not required to plug data into his model at class certification. But the defect is more fundamental. Their expert has not made *or* run a model. All he did was identify a general measure of damages without explaining how he'd remove price inflation attributable to meme-stock volatility. Plaintiffs can't secure class certification through a bare promise to figure out later how to develop a model, particularly when a stock behaves as unusually as Cassava's did.

In short, Plaintiffs continue to sweep Cassava's meme-stock dynamics under the rug. Adopting that nothing-to-see-here approach would set a harmful precedent as lower courts confront more cases involving stocks that behaved in ways that defy ordinary economic models. This Court should reverse.

## ARGUMENT

### I.   Plaintiffs' mootness argument does not shield the flawed class-certification order from scrutiny.

Plaintiffs try (at 35-39) to avoid this Court's review by arguing that the appeal became moot when they agreed with half of the Defendants to

settle their claims and release Defendants from liability. Notably, however, Plaintiffs have not filed a motion to dismiss the appeal. That is for good reason. Even by Plaintiffs' account, the case is not moot.

Plaintiffs insist that all "Defendants *will* enjoy absolute resolution of litigation *following final district-court approval*: Plaintiffs *will* dismiss their securities-fraud claims against each Defendant, and this lawsuit ends." Answering Br. 36 (emphasis added). Put another way, Plaintiffs argue that the case may become moot in the *future* if the district court at some point approves a settlement and if Plaintiffs then dismiss their claims. But Plaintiffs haven't dismissed their claims. And the issues that led this Court to grant Rule 23(f) review are as important as ever. Indeed, Defendants face a copycat lawsuit that will raise the same questions about how meme-stock dynamics interact with the requirements for class certification. *Ugarte v. Cassava Sci., Inc.*, No. 1:24-cv-1525 (W.D. Tex.) (Ezra, J.).

The settlement agreement struck by Plaintiffs and half of Defendants also doesn't moot the dispute over the validity of the district court's class-certification order. *See In re Nexium Antitrust Litig.*, 778 F.3d 1, 2 (1st Cir. 2015) (denying motion to dismiss appeal from order certifying

class based on settlement because the "parties continue to disagree about whether the class certification was proper"). Plaintiffs' agreement to a settlement does not bind the class, which upon "certification" has "acquired a legal status separate from the interest asserted by [Plaintiffs]." *Sosna v. Iowa*, 419 U.S. 393, 399 (1975); 1 Newberg & Rubenstein on Class Actions § 2:10 (6th ed. 2022). In fact, Plaintiffs haven't even moved for preliminary approval of the class settlement, much less secured the district court's final approval, as required to resolve absent class members' claims. Fed. R. Civ. P. 23(e). "A settlement that can take effect only with court approval does not moot an action unless the court grants approval." Wright & Miller's Federal Practice & Procedure § 3533.2 (3d ed. 1998); *see, e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1264 (11th Cir. 2021).

Even an *approved* class settlement would not moot questions of class certification. A valid class settlement presupposes a class "qualified for certification under Rule 23(a) and (b)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997). Because the district court committed legal errors in certifying the class, the settlement is all the more reason to reverse, wipe the slate clean, and allow the district court to reevaluate the

requirements for certification, as shaped by the settlement context. *Id.* at 620. Leaving the door open to *another* appeal from the *same* class-certification order *after* final approval of a settlement would waste rather than conserve judicial resources. *E.g.*, *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1261-62 (10th Cir. 2004) (reviewing certification order on objectors' appeal from later approval of post-certification settlement).

Plaintiffs have no cases to the contrary. None of the cases cited by Plaintiffs even involve a settlement agreement, much less a settlement agreement in a putative class action. Answering Br. 36-38. "In the class action context, the fact that a case becomes moot as to the named plaintiffs"—which hasn't even occurred here—"does not necessarily deaden the controversy as to the remaining class members." *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 675 (5th Cir. 1985).

Because the appeal is not moot, this Court should resolve the validity of the class-certification order, which the parties continue to contest vigorously. That decision will provide much-needed guidance for this case, for the copycat putative class action pending against Cassava, and for similar cases inside and outside the Circuit.

7

## II.    Plaintiffs cannot prove their claims through a classwide presumption of reliance.

Plaintiffs do not dispute that, if the class is not entitled to a presumption of reliance under *Basic*, then they cannot establish predominance. Opening Br. 30. Defending the class-certification order's application of that presumption with the same strategy their expert employed, Plaintiffs ignore the meme-stock dynamics that dominated Cassava's trading and tally up the *Cammer/Krogman* factors on market efficiency as though this were an ordinary case. This Court should reject their approach for two reasons. First, Plaintiffs never explain how a market plagued by extreme, news-free volatility efficiently incorporated public information throughout the class period. Second, even assuming efficiency, Plaintiffs cannot strip Defendants of their right to present individualized rebuttal evidence showing that a substantial contingent of short-term retail traders in the class did not rely on the integrity of the market price.

### A.    Like the district court, Plaintiffs tally up market-efficiency factors while ignoring glaring indicators of inefficiency.

Plaintiffs' defense of the district court's market-efficiency finding proceeds in three steps, each of which falters. They quibble over whether

8

Cassava was really a meme stock without confronting the market dynamics that matter. They recount the district court's mechanical march through the *Cammer*/*Krogman* factors as though recitation equals analysis. And they dismiss the overwhelming evidence of inefficiency—hyperactive trading volume, vanishing analyst coverage, severe short-selling constraints, and erratic price movements untethered from news. At no point do Plaintiffs grapple with the substance of Defendants' argument that meme-stock dynamics scrambled the very factors Plaintiffs superficially invoke.

Plaintiffs start by debating terminology. Like the district court, ROA.6262-6263, they point out that Defendants' expert, Dr. Stulz, stated that he did not offer an "affirmative opinion that Cassava was a meme stock throughout the class period," Answering Br. 40 (quoting ROA.4132). Many market participants and observers *did* describe Cassava as a prime example of the meme-stock phenomenon. ROA.6448-6455. But prioritizing substance over labels, Dr. Stulz properly focused on the stock's market features that undermined efficiency, not on whether Cassava warrants the "meme stock" moniker (as the term has no official legal definition). Opening Br. 49-50; Chamber Br. 14-15.

Plaintiffs also attack a straw-man argument that the *Cammer/ Krogman* factors are irrelevant because markets for meme stocks are per se inefficient. Answering Br. 40-41. Defendants have never urged a bright-line rule that meme stocks trade in inefficient markets or that courts can't use the *Cammer/Krogman* factors to the extent that they shed light on whether the specific market was efficient. Rather, Defendants argue that the "characteristics of the individual stock itself" remain front and center when applying the factors. *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005). The district court couldn't ignore how the dynamics associated with meme stocks—viral social-media interest, high retail ownership, and short-selling constraints resulting in extreme volatility that is untethered from value-relevant news—interact with those factors. Opening Br. 40-50. Just as courts may not deem meme stocks per se inefficient, they may not treat meme-stock dynamics as irrelevant and mechanically tally the *Cammer/Krogman* factors as if the stock traded in an ordinary market. That reduces market efficiency to the sort of judge-made "checklist" *Unger* forbids. 401 F.3d at 325.

That's the position that Judge McFadden recently adopted: Courts "cannot simply ignore" meme-stock dynamics in favor of a rote

10

application of the *Cammer/Krogman* factors. *Bratya*, 752 F. Supp. 3d at 58. Remarkably, Plaintiffs don't cite *Bratya* even once, all while insisting that "numerous 'courts'" (not identified in their brief) "'have specifically rejected [Defendants'] argument.'" Answering Br. 41 (quoting ROA.6261-6262). The one opinion to squarely and seriously answer the question cuts *against* Plaintiffs.

Because Plaintiffs never confront Defendants' actual argument, they don't explain why the district court could ignore meme-stock dynamics in evaluating market efficiency. Plaintiffs protest (at 48) that the district court satisfied *Basic* by "going through the factors" without making any "*independent* conclusion" as to "'whether the market was, in fact, efficient.'" But their checklist-squared approach (at 21-26) of recounting how the district court tallied the *Cammer/Krogman* factors disregards that those factors are "'tools in arriving at [a] conclusion'" on market efficiency—not an end unto themselves. *Bratya*, 752 F. Supp. 3d at 58; *see* Chamber Br. 9-10. Most of those factors are "'static' indicators" (such as listing on a national exchange) "that say nothing about whether a market is undergoing a temporary period of inefficiency." *Bratya*, 752 F. Supp. 3d at 57. And the factors—when "weighed analytically" in the context of

11

Cassava's dynamic market features rather than "merely counted" in a superficial way—cut decisively against Plaintiffs' hypothesis of market efficiency. *Unger*, 401 F.3d at 323.

***Trading volume.*** Cassava's stock turned over each week on average (49%) what an ordinary public company trades in an entire year—*i.e.*, trading volume was 5,000% higher than normal. Opening Br. 41. Such "hyperactive trading volume" is evidence of "market manipulation." *Bratya*, 752 F. Supp. 3d at 58. But according to Plaintiffs, the district court properly checked a box in favor of market efficiency just because trading volume was high, no matter that the volume was *irrationally* high. Answering Br. 21-22 (citing ROA.6264). That approach is indefensible.

***Analysts.*** Making informed recommendations about Cassava's stock was so difficult that analysts offered wildly different price targets spanning $8 per share to $215 per share, ROA.4225-4226, and all but two analysts ultimately gave up, Opening Br. 42. Plaintiffs' only response is that Cassava's stock traded over the class period near the wide outer ends of the price targets. Answering Br. 42-43. But that makes no sense. If most analysts abandoned their coverage of Cassava, and if the remaining

ones were in entirely different ballparks on price targets, they couldn't have been helping the market translate new information about Cassava into the stock price.

***Short-selling constraints.*** Although Plaintiffs embrace the district court's nose-counting approach of adding up "*122 market makers* active in Cassava stock," Answering Br. 23, they have little to say about short sellers, who "play a role in aligning prices with information under any version of the efficient capital market hypothesis," *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *accord, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Several features of the market here—high outstanding short percentage, low institutional ownership, and high borrowing costs—prevented conventional investors from reacting to negative information by shorting Cassava's stock. Opening Br. 45.

Plaintiffs argue (at 43) that the district court properly kicked the can down the road to trial, where Defendants could cross-examine Dr. Feinstein about his opinion that "high borrowing costs on the ability to short Cassava's stock during the Class Period" did not affect market efficiency. ROA.6270-6271. But the district court had to consider "*all*

13

probative evidence," *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 122 (2021), in deciding market efficiency "before class certification," *Halliburton II*, 573 U.S. at 283; *see also Prantil v. Arkema*, 986 F.3d 570, 576 (5th Cir. 2021) (court needs to decide reliability of expert testimony as part of class certification). This is a problem for today, not tomorrow.

Dr. Feinstein's rebuttal report is incapable of carrying Plaintiffs' burden to prove market efficiency. He did not dispute the existence of constraints on shorting Cassava stock and argued only that investors could have instead traded in Cassava options. ROA.4242-4244. But "[t]he ability of arbitrageurs *simultaneously* to effectuate a short sale along with the options transactions is critical" to incorporate negative information into market prices for *both* stock and options. *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 275 (D. Mass. 2006). Options also traded infrequently because of a wide bid-ask spread and could not have been a mechanism to incorporate information efficiently into the market price. Opening Br. 48-49. So regardless of options, short-selling constraints inhibited market efficiency for Cassava stock. *Bratya*, 752 F. Supp. 3d at 60.

At any rate, Plaintiffs' treatment of short-selling constraints reveals that their expert's opinions were smoke and mirrors. Dr. Feinstein urged the district court to ignore short-selling constraints that impeded market efficiency for Cassava stock because investors could turn to options. ROA.4242-4244. He then opined that, "because the Cassava stock traded in an efficient market," necessarily "Cassava options also traded efficiently," ROA.4252, even though he concluded that the stock market was efficient *on the theory that investors could incorporate information into the stock market through trading in the options market*. Where does anyone actually decide that the market was efficient despite severe short-selling constraints? Plaintiffs are the ones afflicted by "pretzel logic." Answering Br. 50.

Plaintiffs also insist that "Cassava *never* underwent a short squeeze or short-selling ban." Answering Br. 43. But courts have treated short-selling constraints as critical evidence of market inefficiency even in cases that don't involve short squeezes or formal bans. *E.g.*, *PolyMedica*, 453 F. Supp. 2d at 273-74. Instead of looking for a short squeeze, ROA.4139, Dr. Stulz looked more specifically for the mechanisms that impede informational efficiency, ROA.6469-6471. Those mechanisms

15

produced a staggering 1,800% price increase in the first seven months of 2021—surpassed only by GameStop and AMC, two meme stocks that also were subject to short squeezes. Opening Br. 39. If that isn't enough to require a district court to scrutinize short-selling constraints, then *every* stock will waltz through the *Basic* gateway of market efficiency.

***Erratic price movements.*** Plaintiffs mistakenly treat (at 50-52) a lack of price impact as relevant only to rebutting the presumption that a particular alleged misrepresentation affected the stock price. *See Goldman*, 594 U.S. at 119. Before getting to that question, Plaintiffs must first establish under *Basic* that the market was efficient. And the lack of "any reliable relationship between changes in [a company's] stock price and news events" undermines "a finding of market efficiency." *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001); *see* Chamber Br. 15-17.

Plaintiffs again attack a false version of Defendants' argument. Defendants agree that "price volatility" alone does not prove market inefficiency. Answering Br. 41. Volatile news of course can lead to volatile price swings. But Cassava's stock price was extremely volatile even *without* any news relevant to market price. Opening Br. 46-48. Such news-free volatility is highly relevant to market efficiency. *George v. China*

*Auto. Sys., Inc.*, 2013 WL 3357170, at *10 (S.D.N.Y. July 3, 2013). That is especially true for stocks like Cassava, where scholarly research confirms that price movements are "emotionally driven based on the underlying companies' cultural relevance" rather than information about "the companies' underlying fundamentals." Dhruv Aggarwal, Albert H. Choi & Yoon-Ho Alex Lee, *The Meme Stock Frenzy: Origins and Implications*, 96 S. Cal. L. Rev. 1387, 1401 (2024).

Plaintiffs also make a serious concession in addressing price swings during February 2021. On February 2, Cassava announced early-stage trial results, and the stock had large price drops each of the following three days. Opening Br. 47. Plaintiffs' rationalization is that the market "continued to process and react to that news" days later. Answering Br. 44. But that argument is at odds with the core premise of securities litigation that efficient markets react to bad news in real time and update prices "almost immediately." *Unger*, 401 F.3d at 324 (relying on same-day price changes); *see, e.g.*, *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016) (rejecting use of "two-day window" to calculate price impact). Plaintiffs never explain how the market

17

could be inefficient enough that incorporating new information takes more than one day (here, *four* days) but still efficient enough to presume that everyone bought at a market price that reflected all relevant information about Cassava on every day of the class period. Because Plaintiffs concede (at 48 n.13) that they "must show market efficiency throughout the Class Period," their admission that the market took more than one day to incorporate the news of February 2 is fatal to class certification.

Plaintiffs had the burden to prove market efficiency in view of all pertinent market features. *Bell*, 422 F.3d at 316. Because Plaintiffs did not reconcile Cassava's meme-stock dynamics with the efficient-market hypothesis, this Court should reverse.

## B. Plaintiffs cannot strip Defendants of their right to present individualized rebuttal evidence.

But even if one accepts the premise that the market was efficient, Plaintiffs face another problem: The class ranks swell with meme traders who did not "make investment decisions based upon *price and price alone*." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015). Typically, "'most investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an

unbiased assessment of the security's value in light of all public information.'" *Halliburton II*, 573 U.S. at 273 (emphasis altered). But Cassava securities attracted a high percentage of investors who were inspired by "cult-like affinity consideration and other non-financial drivers." Chamber Br. 18 (quoting John W. Bagby & Nizan Geslevich Packin, *Meme-Manipulation: Towards Reinvigorating the Regulation of Speculative Devices*, 74 Am. U. L. Rev. 1155, 1168 (2025)); *see* Opening Br. 51-54. Because Defendants have a right to present "individualized rebuttal" that class members didn't make their decisions on price alone, any class trial will deteriorate into mini-trials on reliance. *Halliburton II*, 573 U.S. at 276.

Neither of Plaintiffs' responses substantively engages with Defendants' right to present individualized rebuttal. First, Plaintiffs appear (at 49-50) not to grasp that Defendants may argue in the alternative. Even if one accepts the district court's conclusion that Cassava traded in an efficient market despite meme-stock dynamics, Defendants still may rebut *Basic* by showing that absent class members did not trade in reliance on the integrity of the market price. *Halliburton II*, 573 U.S. at 276. Second, Plaintiffs insist (at 50) that Defendants needed to show a "specific percentage of class members [who] were motivated by anything

19

other than the integrity of the market." But that gets the problem exactly backward. The only way to determine that percentage would be through the very mini-trials Plaintiffs say are unnecessary. And the record already shows this is no hypothetical concern: Short-term retail traders held 60% of Cassava's stock during the class period, and Defendants introduced evidence that many of those traders openly discussed on social media trying to trigger a short squeeze. ROA.6451-6452; *see* Opening Br. 13; *cf. Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 823 (3d Cir. 1988) (holding that short seller did not rely on integrity of market price).

Whatever the specific percentage that laborious "individualized rebuttal" would ultimately reveal, that percentage far exceeds "the occasional class member here or there." *Halliburton II*, 573 U.S. at 276. Meme-stock dynamics prevent Plaintiffs from proving reliance on the integrity of the market price on a classwide basis, even aside from whether they can prove market efficiency.

## III.   If the class can rely on a presumption of reliance, Plaintiffs are atypical because they did not trade in reliance on the market price's integrity.

Plaintiffs' attempts to establish predominance under *Basic*, if accepted, would expose them as atypical class representatives. Their own

20

unique reliance issues will require that they "devote considerable time to rebut Defendants' claims" on individualized grounds, diverting party and judicial resources away from the class. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005).

Plaintiffs say (at 60) their claims are typical of other class members because "they bought Cassava securities" and believed "the company was a good investment that would appreciate in value." But believing Cassava to be a good investment isn't the test under *Basic*. Plaintiffs must establish that they relied on the "integrity of the market price" as a composite of all public information about Cassava. *Halliburton II*, 573 U.S. at 276. Here, they do not point to anything countering the evidence that they did not treat the market price as a proxy for all public information about Cassava.

Plaintiffs contend that Mr. Bozorgi can rely on *Basic*'s presumption because he testified that he "didn't remember" why he made inexplicable leveraged trades so far off the typical risk spectrum that HSBC closed his account. Answering Br. 58; *see* ROA.6610-6612. Specifically, Mr. Bozorgi could not explain why he bought the stock and repeatedly cycled in and out of positions, churning through nearly $15 million in leveraged

21

Cassava positions over a matter of weeks. ROA.4363-4364, 6614-6618, 6629-6630, 7977-7986. But forswearing any thought process behind erratic trades is not a safe harbor under *Basic*. "I don't remember" is not proof of reliance—it is evidence of no reliance at all.

Even aside from unwillingness to explain his thought process, Mr. Bozorgi's trading history undermines any suggestion that he relied on the market price as an "'unbiased assessment of the security's value'" or expected a "market correction" through the market price's incorporation of "public information within a reasonable period." *Halliburton II*, 573 U.S. at 273-74. His rapid trading instead reflects efforts to capitalize on wild price swings for Cassava and other volatile meme stocks. ROA.7981-7983. His intraday trading even occurred in a period when Plaintiffs admit the market took more than a day to respond to new information. *See supra*, at 17. So the only explanation for this erratic trading is an attempt to profit from the market price's *lack* of integrity during volatility caused by social-media buzz or market manipulation. Opening Br. 13; *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

The same is true for Mr. Calderone. Plaintiffs protest (at 57-58) that Mr. Calderone needed no independent basis for his trades because "that's precisely the point of the *Basic* presumption." But *Basic* allows a plaintiff to prove reliance on an alleged misrepresentation by proving reliance on a market price that incorporated that misrepresentation. It does not excuse a plaintiff from demonstrating reliance on the market price itself. *See Halliburton II*, 573 U.S. at 276. Yet Plaintiffs want a presumption squared: presume the market price reflected the misrepresentation and presume the named plaintiffs relied on the integrity of the price—no questions asked. Here, Mr. Calderone bought Cassava stock because he overheard a segment on a podcast. ROA.6644-6646. He then cycled his entire portfolio through Cassava shares in a single month, making same-day trades to profit from price swings that occurred in the absence of any new price-relevant information about Cassava. ROA.6650-6652. That trading history subjects Mr. Calderone to the same individualized rebuttal as Mr. Bozorgi.

Plaintiffs respond (at 59) to Mr. Rao's reckless options trading with little more than "So what?" But the answer matters. Mr. Rao didn't rely on the integrity of the market price. He believed that the FDA had

23

already approved simufilam. ROA.6685. That belief was wrong—and critically, it was a belief the market did not share. If the market for Cassava securities was efficient, as Plaintiffs insist, then the market price already reflected the publicly known fact that simufilam had not been approved. Opening Br. 59. And this is much more than a mere "factual difference." Answering Br. 60. A class representative who traded based on a private "misunderstanding" about a company's most important product—rather than on the integrity of the market price—will face individualized rebuttal evidence going to the heart of reliance, not to some collateral detail. *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 436 (S.D.N.Y. 2015). Mr. Rao is atypical of any class whose claims rest on the *Basic* presumption.

Plaintiffs urge (at 57-58) this Court to affirm even if they face serious individualized defenses to their reliance on the integrity of the market price. But a named plaintiff's lack of reliance is a paradigmatic example of an issue that defeats typicality. *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984). Pointing to *Feder*, Plaintiffs argue that "arguably unique defense[s]" do not "necessarily destroy[] typicality." Answering Br. 57-58 (quoting 429 F.3d at 137). Yet *Feder* held only that

24

a plaintiff remained typical despite post-disclosure purchases. 429 F.3d at 137-38. Here, the problem is not *when* Plaintiffs traded but *why*. Bozorgi couldn't explain his trades at all, ROA.6629-6630, 6884-6886, Calderone dove in after overhearing a podcast, ROA.6644-6646, and Rao thought simufilam was already FDA-approved, ROA.6685.

Plaintiffs also accuse (at 57) Defendants of "ignor[ing]" *Angell v. GEICO Advantage Insurance Co.*, 67 F.4th 727, 736 (5th Cir. 2023), and *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). In *Angell*, the named plaintiffs shared the same legal theory as the class—breach of the same policy language—and differed only as to which fees they were owed. 67 F.4th at 737. And in *Mullen*, the named plaintiffs and class members all alleged injury from the same defective ventilation system and differed only in the specific illness each suffered. 186 F.3d at 625. Neither case holds that a named plaintiff can satisfy typicality even if he does not share in the presumption of reliance that binds the class together and must answer completely "different legal questions," *Angell*, 67 F.4th at 737, about his actual reliance on the alleged misrepresentations.

25

In any event, this Court cannot "defer[]" to a decision that doesn't exist. Answering Br. 58 (quoting *Feder*, 429 F.3d at 136-37). The district court never addressed whether Plaintiffs' trading histories sever the link between the alleged misrepresentations and their purchases, instead mischaracterizing that reliance issue as affecting just "damages." ROA.6250. Even though Defendants highlighted the district court's misunderstanding, Opening Br. 55, Plaintiffs never try to show that the district court actually grappled with their atypicality as to reliance and in fact commit the same error in referring only to "damages," Answering Br. 18, 34. So typicality is another reason to reverse.

## IV. Plaintiffs cannot evade *Comcast* by slapping an "out-of-pocket" label on their black-box damages model.

Plaintiffs also have no good response to the requirement that a plaintiff's damages model "must measure only those damages attributable to" the theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Reducing *Comcast* (like *Basic*) to a box-checking exercise, Plaintiffs argue (at 53) that the district court correctly called it a day once Dr. Feinstein identified the out-of-pocket measure as a "tried-and-true" way to calculate damages in securities-fraud cases. ROA.6279-6280. But

26

*Comcast* requires far more than selecting a methodology in a vacuum. The plaintiff must demonstrate the methodology can be adapted to the circumstances of the case to capture only the harms attributable to the allegedly wrongful conduct—and nothing else. *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004) (holding even before *Comcast* that an expert could not simply intone the "magic formula" of one of the "two recognized methods of proving anti-trust damages"). That's why the Supreme Court reversed in *Comcast*: The court of appeals "simply concluded that [the plaintiffs] 'provided a method to measure and quantify damages on a classwide basis'" without "decid[ing] 'whether the methodology was a just and reasonable inference or speculative.'" 569 U.S. at 35 (brackets omitted).

Trying to sidestep the issue, Plaintiffs recast (at 53-54) the dispute as a timing objection over whether *Comcast* required Dr. Feinstein to have "plugged in the actual data." But Defendants never argued Plaintiffs must "actuall[y] execut[e]" their model before a court certifies a class. *Ludlow*, 800 F.3d at 689. The problem is not the failure to plug in data, but the failure to build the model into which Plaintiffs could later plug data.

27

Aside from that mischaracterization, Plaintiffs have little to say in defense of Dr. Feinstein's failure to explain how he would calculate out-of-pocket damages in the context of this case. They point out that Dr. Feinstein assured the district court that he would "'carefully examine the factual record'" and deploy unspecified "valuation tools" to calculate out-of-pocket damages based on marginal price inflation between the date of purchase and date of sale. Answering Br. 55 (quoting ROA.4275-4276). Yet he never identified what those tools are nor explained how they would disentangle fraud-related inflation from meme-stock volatility. ROA.6437, 6499, 6510-6511; *see* Opening Br. 63-64. Because the devil is in the details, that "preliminary overview of how ... damages might be calculated" is inadequate under *Comcast*. *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020).

Plaintiffs cannot salvage (at 54-57) their case under this Court's decision in *Ludlow*. Far from being an end run around *Comcast*, *Ludlow* reinforces that any acceptable damages model must have a mechanism that "allows for the removal of ... events later found to not correct the misrepresentations." 800 F.3d at 689. Dr. Feinstein never developed any such mechanism to remove price inflation attributable to other sources,

28

Opening Br. 64-65, so his placeholder out-of-pocket damages model "travel[s] to a place forbidden by *Comcast*," *Ludlow*, 800 F.3d at 688. Plaintiffs lose under the part of *Ludlow* that they ignore: "The *ability* to do so, not the actual execution of that correction, is what *Comcast* requires at this stage." *Id.* at 689.

Plaintiffs do not shore up Dr. Feinstein's inability to disaggregate meme-stock inflation from alleged fraud-related inflation. As Defendants explained, the mechanism he suggested—working "chronologically backwards" through inflation removed by each alleged corrective-disclosure statement—implies a negative stock price during much of the first year of the class period. Opening Br. 65 (quoting ROA.5821-5822). As one federal court recently put it when excluding Dr. Feinstein's damages model for overrepresenting inflation during the class period, this "simply makes no sense." *In re Vale S.A. Sec. Litig.*, 2026 WL 1002335, at *13 (E.D.N.Y. Apr. 13, 2026); Opening Br. 63 (collecting cases excluding Dr. Feinstein's models). Plaintiffs respond only that Dr. Feinstein disavowed that he "would rely exclusively or primarily on back-casting," which yields a negative stock price. Answering Br. 56 (quoting ROA.4188). But that answer only heightens the concern. If the one mechanism

29

Dr. Feinstein identified produces nonsense results, and if Plaintiffs now disclaim primary reliance on it without identifying any substitute, then there is no discernible model at all.

Because Dr. Feinstein never explained how his black-box approach would isolate inflation attributable to the alleged misrepresentations from Cassava's meme-stock volatility, Plaintiffs have not established under *Comcast* that they could prove their claims on a classwide basis without individualized damages issues swamping the proceedings.

## V.     Even on appeal, Plaintiffs continue to capitalize on the skewed playing field created by procedural errors.

After Plaintiffs filed a rebuttal expert report that attempted for the first time to address Cassava's meme-stock dynamics, the district court committed a trifecta of procedural errors in striking Defendants' surreply report, refusing to conduct a *Daubert* inquiry, and dispensing with a hearing on the class-certification motion. Opening Br. 66-70. Plaintiffs do not dispute that those three steps combined to shield the rebuttal report from any scrutiny. They instead raise a series of flawed procedural objections.

First, Plaintiffs argue that the striking of Defendants' surreply report was "Defendants' own fault" because the magistrate judge had

warned against new evidence. Answering Br. 61 (citing ROA.4530). That response is circular. Defendants challenge the initial decision to bar new evidence—not only the later decision to *enforce* the challenged restriction. Opening Br. 67-68. Because Plaintiffs held back their evidence on meme-stock dynamics for reply, the district court could not deprive Defendants of an adequate opportunity to counter that new evidence in a like-for-like manner. *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774 (5th Cir. 2024).

Plaintiffs protest (at 62) that permitting Dr. Stulz's surreply report would itself trigger a further round of new evidence. But *Anadarko* does not create an infinite loop. The party blindsided by new reply evidence gets one fair chance to answer it—including with a surreply report. Opening Br. 68. If a surreply report goes beyond responding to Plaintiffs' new evidence, then the district court retains its traditional discretion to "decline to rely on the new arguments and evidence"—just as with a reply brief that strays beyond its proper focus. *Anadarko*, 99 F.4th at 774.

Second, Plaintiffs defend (at 63-64) the striking of Defendants' *Daubert* motion on timeliness grounds. But Defendants could not have moved to exclude the 110-page rebuttal report before it existed. And both

31

sides announced shortly after Plaintiffs filed that report that *Daubert* motions were forthcoming. Opening Br. 17-19. The magistrate judge issued her report and recommendation before either side could file them. Because the district court must "perform a full *Daubert* analysis" with "the same rigor . . . as at trial," *Anadarko*, 99 F.4th at 774-75, it could not wave off scrutiny of Dr. Feinstein's methodology.

Third, Plaintiffs note (at 62) that evidentiary hearings are discretionary. But when the district court foreclosed the surreply report and refused to entertain the *Daubert* motion, the evidentiary hearing was the only remaining mechanism to test Dr. Feinstein's new opinions—opinions on which the certification order extensively relied. Opening Br. 67 (citing ROA.6245, 6263, 6265, 6274). "[T]rial-court discretion in choosing the manner of testing expert reliability" can't be "discretion to abandon the gatekeeping function" altogether and insulate an expert's key conclusions from every available form of adversarial testing. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158-59 (1999) (Scalia, J., concurring).

Plaintiffs' brief confirms that the procedural errors slanted the record. They rely on Dr. Feinstein's untested rebuttal report to supply their answers on core disputed issues, including the definition of a meme stock,

32

Answering Br. 40-41 (citing ROA.4203, 4206); whether Cassava was a meme stock, *id.* at 44 (citing ROA.4220); the extreme highs and lows for Cassava's share price, *id.* at 42 (citing ROA.4225); the explanation for price swings on days with zero value-relevant news, *id.* at 44 (citing ROA.4231); whether the market for Cassava options was efficient, *id.* at 49 (citing ROA.4252); and whether their damages model accounted for meme-stock related market dynamics, *id.* at 55 (citing ROA.4276). In total, they cite the rebuttal report more than two dozen times—a number that far outstrips the number of citations to Dr. Feinstein's original report.

Plaintiffs did not carry their burden at class certification even with Dr. Feinstein's rebuttal report. But if this Court does not reverse, it should vacate based on these procedural errors, which together accomplished a systematic denial of the adversarial process in a case that— more than most—demanded it. This is the first time a court of appeals will consider *Basic*'s application to meme-stock dynamics. The district court resolved that novel question on a record in which one side's expert opinions were shielded from every form of challenge the rules provide.

# CONCLUSION

This Court should reverse the class-certification order because Plaintiffs did not carry their burden to prove predominance and typicality. At a minimum, the Court should vacate the order, which was tainted by serious procedural errors.

DATED:    April 20, 2026                 Respectfully submitted,


                                         /s/ *Gregg Costa*
                                         Gregg Costa

                                         GIBSON, DUNN & CRUTCHER LLP
                                         Gregg Costa
                                         gcosta@gibsondunn.com
                                         Lloyd S. Marshall
                                         lmarshall@gibsondunn.com
                                         811 Main St., Suite 3000
                                         Houston, TX 77002
                                         Telephone: (346) 718-6600

                                         Monica K. Loseman
                                         mloseman@gibsondunn.com
                                         Scott Campbell
                                         scampbell@gibsondunn.com
                                         1801 California St.
                                         Denver, CO 80202
                                         Telephone: (303) 298-5700

34

Brian Richman
brichman@gibsondunn.com
2001 Ross Avenue, Suite 2001
Dallas, TX 75201
Telephone: (214) 698-3100

Patrick J. Fuster
pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

*Counsel for Defendants-Appellants*
*Cassava Sciences, Inc. and Eric J.*
*Schoen*

BAKER & HOSTETLER LLP

Douglas W. Greene
dgreene@bakerlaw.com
Zachary R. Taylor
ztaylor@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 847-7090

C. Shawn Cleveland
scleveland@bakerlaw.com
2850 N. Harwood St., Suite 1100
Dallas, TX 75201
Telephone: (214) 210-1210

*Counsel for Defendants-Appellants*
*Remi Barbier and Lindsay Burns*

## CERTIFICATE OF SERVICE

I certify that, on April 20, 2026, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

/s/ *Gregg Costa*
Gregg Costa

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word for Microsoft 365. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 6,497 words, excluding the parts exempted by Rule 32(f).

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ *Gregg Costa*
Gregg Costa